NATIONAL FARMERS UNION PROP-
ERTY AND CASUALTY COM-
PANY, Appellant,

v.

Laurence COLBRESE, Jr., Appellee.

No. 20550.

United States Court of Appeals
Ninth Circuit.

Nov. 7, 1966.

Rehearing Denied Dec. 8, 1966.

John C. Sheehy, of Wiggenhorn, Hut-ton, Schiltz & Sheehy, Billings, Mont., for appellant.

Louis R. Moore, of Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., for appellee.

Before BARNES, JERTBERG and ELY, Circuit Judges.

ELY, Circuit Judge:

The appellant, defendant below, appeals from the District Court's denial of its motion for summary judgment and the entry of judgment in favor of appellee. The District Court's jurisdiction was based upon diversity of citizenship of the parties and the requisite amount in

controversy, 28 U.S.C. § 1332, and our power of review is conferred by 28 U.S.C. § 1291.

On December 3, 1960, the appellee's son was killed in an automobile accident, and appellee instituted suit for alleged wrongful death in a Montana state court. In that suit, the defendant was Jerry Kinney, a minor who was operating the automobile in which the deceased was riding as a passenger at the time of the fatal accident. The appellant, which had issued automobile indemnity insurance policies to Jerry Kinney's father, denied obligation and refused to furnish assistance in defense of the state court action. The parties to that action agreed that the state court should enter a judgment for $18,850 in appellee's favor. Appellee then gave Jerry Kinney a satisfaction of the judgment in exchange for an assignment in which Jerry Kinney transferred his rights against appellant to the appellee. This action followed.

Jerry Kinney was not the "named insured" in any policy issued by the insurance company, nor was the car he was driving at the time of the fatal accident, a 1949 Ford, described in any of the company's insurance policies then in force. His alleged right to indemnity rests upon a clause appearing in each of two policies issued to Albert Kinney, Jerry's father. These policies provided coverage for periods which included the date of the accident and were identical except for the designation of the vehicle described as the "owned automobile" in each of the two policies. Each policy described one of two motor vehicles which were owned by Albert Kinney, neither of which, as has been said, was the particular automobile which was involved in the accident.

The policies were each entitled, "Family Automobile Policy," and each contained provisions defining those covered as "insureds." The provisions read,

"(a) With respect to the owned automobile,

(1) the named insured and any resident of the same household,

(2) any other person using such automobile, provided the actual use thereof is with the permission of the named insured;

(b) *With respect to a non-owned automobile,*

(1) *the named insured,*

(2) *any relative, but only with respect to a private passenger automobile or trailer not regularly furnished for the use of such relative;*

(c) Any other person or organization legally responsible for the use of:

(1) an automobile or trailer not owned or hired by such person or organization, or

(2) a temporary substitute automobile, provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such automobile or trailer." (Emphasis supplied.)

The appellee contends that Jerry Kinney was insured under the provision, italicized above, as a "relative" of Albert Kinney, "the named insured," operating a "non-owned * * * private passenger automobile * * * not regularly furnished for the use of such relative."

A disputed fact question was resolved by the jury, which, in its answer to a special interrogatory, found that the 1949 Ford was "not regularly furnished for the use of" Jerry Kinney.

The determinative issue on this appeal is whether or not, at the time of the accident, the Ford was, with respect to the named insured, Albert Kinney, a "non-owned automobile." The district judge determined, as a matter of law, that it was.

At some time before February 25, 1957, one Ehart had owned the Ford, and a Montana certificate of title had been issued to him. Ehart died on the last mentioned date, leaving Robert McCormick as his sole heir. McCormick died

later in 1957, leaving all his property to his wife. Mrs. McCormick then, in 1957,[1] agreed to sell the Ford to Albert Kinney. She was paid the whole agreed consideration by Kinney, and she delivered to Kinney the keys and the Montana registration certificate. Kinney was, with the registration certificate, enabled to purchase a Montana license for the car in his own name. No certificate of ownership was executed or transferred to him. Since the purchase in 1957, both Mrs. McCormick and Albert Kinney have regarded the automobile as being the property of Kinney. He repaired it and restored it to operating condition in 1958. He maintained possession of it and purchased insurance to cover its operation. He insured it with the defendant company as the "owned automobile" under "family" policies from September 2, 1958, to September 2, 1960. The car then ceased to function properly, and the insurance was not renewed. Despite numerous requests by Kinney to the attorney handling the Ehart estate, no certificate of title had been furnished to him or obtained by him. As a result, the only outstanding certificate of title to the Ford at the time of the accident was that which had been issued to Ehart in June, 1951.

The relevant provisions of the Montana statute relating to sale and transfer of automobiles are as follows:

"(a) Upon a transfer of any title or interest of an owner or owner in or to a motor vehicle registered under the provisions of this act as hereinbefore required, the person or persons whose title or interest is to be transferred shall write their signatures with pen and ink upon the certificate of ownership issued for such vehicle, in the appropriate space provided upon the reverse side of such certificate, and such signature shall be acknowledged before a notary public.

(b) Within ten (10) days thereafter, the transferee shall forward both the certificate of ownership so endorsed and the certificate of registration, together with the information required under section 53–107, to the registrar, who shall file the same upon receipt thereof and no certificate of ownership and certificate of registration shall be issued by the registrar of motor vehicles until the outstanding certificates are surrendered to that office or their loss established to his reasonable satisfaction.

(d) *Until said registrar shall have issued a certificate of registration and certificate of ownership and statement as hereinbefore provided, delivery of any motor vehicle shall be deemed not to have been made and title thereto shall not have passed and said intended transfer shall be incomplete and not be valid or effective for any purpose.*

(e) In the event of a transfer by operation of law of any title or interest of an owner of the legal title or owner in and to a motor vehicle registered under the provisions of this act, as upon inheritance, devise or bequest, order in bankruptcy or insolvency, execution sale, repossession upon default in the performance of the terms of a lease or executory sales contract, or otherwise than by voluntary act of the person whose title or interest is so transferred, the executor, administrator, receiver, trustee, sheriff or other representative or successor in interest of the person whose title or interest is so transferred shall forward to the registrar of motor vehicles an application for registration in the form required for an original application for registration, together with a verified or certified statement of the transfer of such title or interest which statement shall set forth the reason for such involuntary transfer, the title or interest so transferred, the name or names of the person or persons to whom such title or interest is to be transferred, the process of procedure effecting such

---

1. While the finding of the district judge is that the sale took place "on or prior to September 2, 1958," the parties agree in their briefs to this court that it occurred during the year 1957.

transfer and such other information as may be requested by the registrar and with such statement shall be furnished such evidence and instruments as may otherwise be required by law to effect a transfer of legal or equitable title to or an interest in chattels as may be required in such cases, and in the event the registrar shall be satisfied that such transfer is regular and that all formalities as required by law have been complied with, he shall cause to be sent to the owner, conditional sales vendors, lessors, mortgagees and other lienors, as shown by his records notice of such intended transfer and thereafter, but not less than five (5) days thereafter, shall register such motor vehicle and shall issue a new certificate of ownership and certificate of registration to the person or persons entitled thereto. The notice herein required shall be deemed complied with by deposit in the post office in Deer Lodge, Montana, such notice, postage prepaid, addressed to such person or persons at the respective addresses shown on his records." Section 53–109, R.C.M. 1947. (Emphasis supplied.)

The district judge determined, under section 53–109(d), italicized above, that the attempted transfer of ownership from Mrs. McCormick to Albert Kinney was a nullity. He concluded that he was compelled by the decision of the Supreme Court of Montana in Safeco Insurance Co. of America v. Northwestern Mutual Ins. Co., 142 Mont. 155, 382 P.2d 174 (1963), to hold that the Ford was, in its relation to Albert Kinney, a "non-owned automobile," because no certificate of title in Kinney's name had ever been issued.

Appellant must admit, and it does, that there was no compliance with section 53–109(a) and (b), if such was required, and appellee concedes that section 53–109(d) applies, by its own terms, only to transactions which are required to be formalized pursuant to the procedures "hereinbefore" prescribed, that is, prescribed by section 53–109(a), (b) and (c). The dis-

pute, then concerns the applicability of subsection (d). Appellant contends that the course of events by which the ownership of the car passed from Ehart through the McCormicks to Albert Kinney—in practical effect, at least, if not in legal contemplation—falls entirely within section 53–109(e) and that subsection (d) is therefore inapplicable. We disagree.

Whether the Montana registrar of motor vehicles would require successive transfers of title, first from Ehart to Robert McCormick, then from Robert McCormick to Mrs. McCormick, and finally, from Mrs. McCormick to Albert Kinney, or whether, upon being made aware of the circumstances, he would issue only one certificate of title, and that in the name of Albert Kinney, without the intermediate steps having been taken, is of no moment. The fact is that, since the instant before the death of Ehart, there have been three transfers or attempted transfers of the ownership of the automobile. In none of these were the requirements of section 53–109 satisfied. For reasons deemed by it to be sufficient, the Montana Legislature has declared that the prescribed procedure for the voluntary transfer of title to automobiles shall be mandatory. If appellant's construction of the statute were correct, then at any time when a transfer by operation of law occurred, the successive owners of the automobile involved could thereafter ignore the legislative mandate with impunity. It cannot be that the Legislature intended that its mandate might be so easily avoided, nor do we feel constrained by the language of the statute to so hold. The first two transfers were undoubtedly by operation of law, governed by section 53–109(e), but the third, from Mrs. McCormick to Albert Kinney, was not. It was a voluntary transfer and, as such, was required to be made pursuant to subsections (a) and (b). Since it was not so made, section 53–109(d) declares that "said intended transfer shall be incomplete and not be valid or effective for any purpose."

We do not believe, however, that our foregoing conclusion is dispositive. As we read section 53–109(e), its only effect is that legal title to an automobile cannot pass to a voluntary transferee in the absence of compliance with the statutory procedure. Since there was no such compliance here, legal title did not, "for any purpose," pass to Albert Kinney. The crucial question is not the identity of the holder of the legal title but whether or not the car was "non-owned" by Kinney as the term is employed in the insurance contract.

In Matsuo Yoshida v. Liberty Mutual Insurance Co., 240 F.2d 824 (9th Cir. 1957), and in Teixeira v. Globe Indemnity Company, 349 F.2d 502 (9th Cir. 1965), our court recognized that even if a statute purports to define ownership of an automobile, the provision does not necessarily fix the meaning of the phrase "owned automobile" as the phrase is employed in an insurance policy; rather, it is the meaning intended by the parties which controls.

In *Teixeira*, supra, the insured's stepson was involved in an accident while driving a car which had been left with the family some five months earlier by a friend who left to work on board a ship. It was intended by the friend that the members of the family would use the car during his absence, but there was never any agreement to purchase the car, nor were any payments to him ever made. As the court interpreted the policy, which contained provisions similar to those contained in the policies before us, the insurer would be liable only if the car was an "owned automobile" of the insured. We affirmed the judgment of the District Court, being "aware of no decision of a reviewing court which has extended the usual and ordinary meaning of the definition of the words 'owned automobile' which appear in the insurance policy in the instant case to include such a tenuous relationship as existed between Mrs. Teixeira and the Corvair automobile." 349 F.2d at 505.

Liability of the insurer in *Yoshida*, supra, was dependent upon a finding, as is the liability of the appellant herein, that the automobile was "non-owned." Gonzales, the insured, was a conditional sale contract vendee, and legal title remained in the vendor at the time of the accident. It was held that Gonzales was nevertheless the owner of the car and that his insurer was not liable. An applicable California statute defined "owner" to include the purchaser under a conditional sale agreement, but we noted,

"Of course, the statutory definition is not necessarily controlling for the words of a contract are to be taken in their ordinary and popular sense. * * * We believe, however, that common understanding of the words 'owner' and 'own' with respect to automotive vehicles accords with our view. Under law the conditional vendee has the beneficial interest in the automobile, including the right of possession. *It is his to drive and use. He lacks only the bare legal title.* * * * If the clause has any common or popular meaning, it means that a person in Gonzales' position is the owner of the car. Indeed, Gonzales so understood, for in the accident report filed after the first accident he inserted his own name in the blank marked 'owner'." 240 F.2d at 827. (Emphasis added.)

Appellee argues that, despite the fact that this court might be disposed to allow the controversy to turn on the meaning of the concept of ownership as it was employed by the parties to the insurance contracts in question, we are bound by the decision in Safeco Insurance Co. v. Northwestern Mutual Ins. Co., supra, to affirm. If *Safeco* had decided the very question involved in the instant case, we would, of course, be constrained to follow. Shuttlesworth v. City of Birmingham, 382 U.S. 87, 91, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). We do not, however, interpret that decision as laying down a hard and fast rule to the effect that an automobile may not under any circumstances be an automobile owned by the insured within the meaning of an

insurance policy unless the insured is the holder of the certificate of ownership.

The instant case is distinguishable from *Safeco* in several material respects.[2] The accident resulting in *Safeco* occurred only *one day* after Harlan Dean, the insured driver, agreed to purchase the car from a dealer, at a time when a substantial portion of the agreed consideration remained unpaid. No papers of any kind were executed or handed over to Dean. There were no records of the sale, not even entries on the dealer's books. Emphasizing the extremely tenuous nature of the agreement, the opinion notes that Dean, after recovering from injuries suffered in the accident, reclaimed his "trade-in" vehicle from the dealer, "and the matter was at an end." In our case, on the other hand, Kinney had paid the entire agreed price, and he had enjoyed undisputed dominion and control over the Ford for a period of nearly three years prior to his son's accident. Moreover, while in *Safeco* neither the dealer nor Dean had made any attempt to comply with the Montana registration or transfer statutes, Kinney had obtained the certificate of registration from Mrs. McCormick. He had bought state licenses and insurance for the car, and he had attempted in an informal way to obtain a certificate of title. The claimed transfer in *Safeco* was even more uncertain than that which our court, in *Teixeira,* characterized as "tenuous." Of Kinney and the 1949 Ford we can say, as we did in *Yoshida,* supra, "It is his to drive and use. He lacks only the bare legal title."

The dealer's insurer in *Safeco* was held to be primarily liable, as against Dean's insurer, under a "garage owners liability policy." Such a policy is designed to provide protection in special situations to persons who, by their occupation, are in regular and frequent contact with a number of motor vehicles, the identity of which is subject to constant change. An insurer issuing such a policy to an automobile dealer must surely contemplate that its protection extends to the use of cars by prospective purchasers. On the facts of *Safeco*, we believe that Dean could have been characterized as being no more than that.

On the other hand, what were the expectations of the parties to the insurance contracts involved in this litigation? The insurer knows that an insured may be the owner of two or more automobiles. For what reason, then, was coverage under a "family automobile policy" extended to a relative's use of non-owned *automobiles*, more than one, not regularly furnished for his use, but only to his use of *the* owned *automobile*, the *one* owned automobile described in the policy? The obvious reason is the frequency with which the owned and described automobile is used or may be used by members of the household. In consideration of an actuarially determined price, or premium, the insurer agrees to indemnify the family members against some of the liabilities to which their driving of motor vehicles might subject them. The more "owned" automobiles or "regularly furnished" non-owned automobiles to which a family has access, the more likely it is that liability will be incurred. Condition 4 of the policy[3] indicates that more than one automobile may be insured, but that would be done, we must assume, only in consideration of a higher premium.

A fundamental principle of insurance law is that a policy is to be construed liberally in favor of the insured and strictly against the insurer, who normally is responsible for the language it contains. As was said in Holmstrom v. Mutual Benefit Health & Accident Ass'n, 139 Mont. 426, 364 P.2d 1065 (1961),

2. The District Court recognized this, writing, "Admittedly the factual situation here is distinguishable [from *Safeco*] in many respects." The District Court also recognized that "It is possible * * * that as applied to a different factual situation the Supreme Court of Montana would modify its interpretation of § 53–109(d)."

3. "When two or more automobiles are insured hereunder, the terms of this policy shall apply separately to each * * *."

"The policy holder must be protected against conflicting, confusing and ambiguous statements in policies and whenever there are two constructions that can be placed upon a policy this court believes the better rule is to apply that construction most favorable to the policy holder." 364 P.2d at 1067–1068.

That sentiment does not prevent application of the more general principle that an insurance policy, like any other contract, must be given an interpretation which is reasonable and which is consonant with the manifest object and intent of the parties.[4] It is manifest here that there was no doubt in the mind of Albert Kinney that he was the owner of the Ford. His recognition of his ownership is clearly evidenced by facts already mentioned, including the fact that for two years of the period of his dominion, he had paid additional premiums as consideration for a separate policy to insure the particular car.

Since 1957, when Mrs. McCormick agreed to sell the Ford to Albert Kinney and surrendered possession to him when she received the agreed price, no person questioned or attempted to disturb Kinney's claim of ownership. Even in this lawsuit there is no contention that the car belongs to someone other than Albert Kinney. The assertion is simply that it is "non-owned" by him. He had, for almost three years before the accident, exercised complete dominion and control over the vehicle. He possessed it, and he repaired it. He held, and presumably still holds, the certificate of registration. He secured state licenses for the car, and for two years he drove it and insured it in a separate policy agreement with the appellant company. Now it is he himself, in effect, through his minor son's assignee, who asserts that the vehicle was "non-owned" by him. If section 53–109(d) did not exist, no reasonable person could question the fact that Kinney was, in every true sense of the word, the owner of the car. If he owned the vehicle, it was not a "non-owned" vehicle within the meaning of the insurance contract. The Montana statute requires us to do no more than to admit that "legal title" did not pass to him.

To hold that Albert Kinney was not the owner of the Ford within the meaning of the policies in suit would do violence to the intention of the parties, to traditional legal concepts of ownership, and to our own sense of right and wrong. There is no Montana authority which, on its facts, compels us to apply the technical statutory requirements for transfer so as to torture the terms of a contract. Absent such compulsion, we will not require appellant to underwrite a risk which it did not assume and afford indemnity for which it was not paid. Upon remand, the action will be dismissed.

Reversed.

---

4. In the interpretation of questionable provisions of an insurance contract, it is the reasonable expectation of the insured which controls.

"Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect."

Gray v. Zurich Insurance Company, Cal., 54 Cal.Rptr. 104, 419 P.2d 168 (Oct. 25, 1966) (Footnotes omitted).

See also Kessler, Contracts of Adhesion —Some Thoughts About Freedom of Contract, 43 Colum.L.Rev. 629, 637 (1943); Patterson, The Interpretation and Construction of Contracts, 64 Colum.L.Rev. 833, 858 (1964). Cf. 3 Corbin, Contracts § 545, at 164 (1960).