**AMERICAN STATES INSURANCE COMPANY, Plaintiff,**

v.

**ANGSTMAN MOTORS, INC., a corporation, et al., Defendants.**

Civ. No. 2902.

United States District Court,
D. Montana,
Havre-Glasgow Division.

May 24, 1972.

---

L. Morris Ormseth, Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for plaintiff.

Jess L. Angstman, Havre, Mont., for Angstman Motors, Inc.

Robert J. Emmons, Smith, Emmons & Baillie, Great Falls, Mont., for U. S. F. & G.

John B. Kuhr, and John A. Warner, Weber, Bosch, Kuhr, Dugdale & Warner, Havre, Mont., for Rueben Johnson.

Robert B. Gillan, Staff Atty., Cascade County Legal Services Assn., Great Falls, Mont., Guardian ad Litem for Ronald Hearn.

J. Chan Ettien, Morrison & Ettien, Havre, Mont., for Ruth Griffin.

## MEMORANDUM OPINION AND ORDER

BATTIN, District Judge.

On August 1, 1968, defendant Johnson arranged to try out a 1952 Chevrolet grain truck owned by defendant Angstman Motors, Inc. (Angstman). It was his intention to purchase this truck, if it was adequate for his needs. Johnson needed a truck to replace one of his trucks which had become inoperable.

Johnson gave Battleson, salesman for Angstman, a check for $450.00 on that date. This was one-half of the price which the parties had agreed upon. Johnson did not sign a certificate of title for the vehicle. Johnson did, however, sign a "blank slip" which was apparently a purchase order for the vehicle.

Johnson took the truck on August 1 and drove it from Havre, Montana, to Kremlin, Montana, where he was custom cutting wheat for his neighbor. The truck was used in this work. However, after Johnson had arrived at the job site the truck would not start by use of the starter. The truck was pulled and started. To avoid further problems, the truck was not shut off during the balance of its use on August 1.

A new starter was installed in the truck on August 2, 1968. It started that morning by use of the starter. Johnson assigned defendant Ronald Hearn to drive the truck that morning. The truck was loaded with grain from a combine. Hearn started for the grain elevator in the truck. On the way he was involved in an accident with a car driven by defendant Ruth Griffin. The truck was a total loss.

On September 6, 1968, Johnson gave Angstman $450.00. He also signed the certificate of title on that date. On September 14, 1968, Angstman forwarded the proper documents to the Registrar of Motor Vehicles, Deer Lodge, Montana. The Registrar issued a title certificate for the truck to Johnson on October 15, 1968.

At the time of the accident, Johnson had in force a policy of liability insurance with Western Pacific Insurance Company. Plaintiff American States Insurance Company (American) later became successor to all obligations and rights under that policy. At the time of the accident, Angstman had in force a liability insurance policy written by defendant United States Fidelity and Guaranty Company (U.S.F. & G.).

American filed this action seeking a declaratory judgment regarding ownership of the truck at the time of the accident, extent of liability of the two insurance companies, and the obligation of defense of Johnson and Hearn in a suit brought by Ruth Griffin and her passengers.

Discovery has proceeded and the case is now before the court on cross motions for summary judgment by plaintiff American, Defendant U.S.F. & G., and defendant Johnson. The court finds that no material issues of fact are in dispute and, therefore, the case is proper for disposition by summary judgment.

I.

█ Common to all other issues is the determination of ownership of the truck at the time of the accident. It is clear from the depositions that no meeting of the minds had occurred between Johnson and Battleson as representative of Angstman. Therefore, in legal contemplation, a transfer of the truck had not taken place. U.S.F. & G. disputes this fact, arguing that a sale had occurred and that Johnson became the owner on August 1, 1968. It is the court's finding, based on the depositions of Johnson and Battleson,[1] that as a matter of law there was not a completed sale.

█ Even assuming that Johnson and Battleson had reached an agreement and

---

1. See Deposition of Johnson: pp. 5–6, 8–11, 12–15, 20–21, 25, 30–34, and 36–40; Deposition of Battleson: pp. 5–8, 10–11, 14–19, 22, 29–31, and 33–35.

that the truck was sold, Montana Law, Revised Codes of Montana, 1947, § 53-109, prevents an effective transfer from having occurred at the time of the accident.

Section 53-109(c) provides that the rules for obtaining title to a vehicle, as stated in Section 53-109(b), do not apply to the "transfer of a motor vehicle to a duly licensed automobile dealer intending to resell such vehicle . . . ." However, the statute goes on to state:

". . . but every such *dealer shall* upon transferring such interest *deliver* such certificate of ownership and certificate of registration with an application for registration executed by the new owner in accordance with the provisions of section 53-107, and the registrar upon receipt of said certification of ownership, certificate of registration and application for registration, together with the conditional sales contract or other lien, if any, shall issue a new certificate of ownership and certificate of registration, . . . ." (Emphasis supplied.)

Section 53-109(d) then provides that until the registrar has issued these documents,

". . . delivery of any motor vehicle shall be deemed not to have been made and title thereto shall not have passed and said intended transfer shall be incomplete and not be valid or effective for any purpose."

These statutes have been construed by the Montana Supreme Court and by this court. Irion v. Glens Falls Insurance Co., 154 Mont. 156, 461 P.2d 199 (1969); Ostermiller v. Parker, 152 Mont. 337, 451 P.2d 515 (1968); Safeco Insurance Co. v. Northwestern Mutual Insurance Co., 142 Mont. 155, 382 P.2d 174 (1963); Phoenix Insurance Co. v. Newell; 329 F.Supp. 172 (D.Mont. 1971); Glens Falls Insurance Co. v. Irion, 323 F.Supp. 1164 (D.Mont.1970); Colbrese v. National Farmers Union

Property & Cas. Co., 227 F.Supp. 978 (D.Mont.1964), reversed, 368 F.2d 405 (9th Cir. 1966).[2]

It is clear from the case law that it is the dealer-seller, and not the buyer, who bears the burden of seeing to timely compliance with the statute. In *Irion* the Montana Supreme Court stated this rule succinctly:

"The legislature has exempted duly licensed automobile dealers from the requirement by paragraph (b) of section 53-109 of securing registration of their vehicular stock in trade, a requirement which would be onerous, but the price the dealers pay for this privilege is that they, the dealers, and not their customers, are to see to the timely and proper registration on resale, and, if they do not, the legislature, in paragraph (d) of section 53-109, has provided a penalty—the dealer will remain the owner with all the responsibilities of ownership—his sale and transfer of possession will be deemed not to have been made and the 'intended transfer * * * incomplete and not * * * valid or effective for any purpose.' " *Irion*, 154 Mont. at 166–167, 461 P.2d at 205.

Applying the facts of this case to the established rule, there was no sale or transfer of possession within legal contemplation. Angstman did not obtain a signed application for registration from Johnson at the time of the alleged sale. It did not send the required papers to the registrar until September 14, 1968, more than one month after the alleged sale. While much argument is made by U.S.F. & G. that it was Johnson who failed to sign the application for registration, because of his great hurry, and that it was he who was responsible for the delay in application, the fact remains that it was the duty of Angstman to see that these matters were completed within the terms of the statute. Because it failed to comply with Section

2. Although Judge Jameson's decision was reversed by the Ninth Circuit Court of Appeals, the Montana Supreme Court held that his interpretation of the statute was correct. *Irion, supra* at 167, 461 P.2d 199.

53–109(c), the sale, if any, was void and ineffective for any purpose by operation of Section 53–109(d).

■ U.S.F. & G. also argues that, because Johnson did sign the application for registration on September 6, 1968, and because Angstman complied with the statute on September 14, 1968, title actually passed on August 1, 1968, under a theory of relation back. This court held in *Phoenix, supra,* on the basis of *Safeco, supra,* that passage of title could relate back to the date of actual transfer.

In *Safeco,* the Montana Supreme Court held that in a *regular* transaction, the new certificate, issued by the registrar, caused the legal transfer to become effective as of the date of actual transfer. In *Phoenix,* this court held that submission of the proper documents on the first Monday after a Saturday sale, and subsequent issuance of a new certificate by the registrar, caused the transfer to take effect on the date of sale, that is, Saturday, rather than on the date of submission of the documents. The basis for this decision was that the dealer had done everything within his power to meet his duty of "timely and proper registration on resale." To have held to the contrary would have been to penalize the dealer for the fact that the county courthouse was not open on Saturday.

However, the same reasoning does not apply in this case. Angstman did not obtain Johnson's required signature on August 1, 1968, but rather obtained it on September 6, 1968. In other words, there was not a regular sale within the meaning of *Safeco.* Moreover, to allow the transfer to become effective as of August 1 by a relation back theory, in this case would be to allow the dealer to escape the penalty of his failure to meet his statutory duty. The consistent application of this statutory duty by the Montana Supreme Court prevents this court from making such a finding.

Consequently, Angstman was the legal owner of the vehicle at the time of the accident and the transfer could not have become effective before September 6, 1968, if then. Since it is immaterial to this case, the court does not reach the question of when title actually passed, except to hold that it had not passed as of August 2, 1968.

## II.

Having determined ownership of the vehicle at the time of the accident, the next question before the court is which insurance company, American or U.S.F. & G., has coverage of Johnson and Hearn.

The Angstman U.S.F. & G. Comprehensive Automobile Liability Policy (auto policy) provides coverage for the insured for all sums which the insured is legally obligated to pay as damages for property damage or bodily injury, to which the insurance applies, "caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading of any automobile, . . . ." "Insured" includes the named insured and

> ". . . any other person while using an owned automobile or a hired automobile with the permission of the Named Insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, . . . ."

Under the Garage Insurance (garage policy) portion of Angstman's U.S.F. & G. policy, coverage is provided for the insured for all damages which the insured is obligated to pay because of bodily injury or property damage, to which the insurance is applicable, caused by an occurrence "and arising out of garage operations", including only automobile hazard #1.

"Insured" under this policy includes the named insured and, with regard to the automobile hazard coverage,

> ". . . any person while using, with the permission of the Named Insured, any automobile to which the insurance applies under the automobile hazard

[in this case hazard #1], provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, . . . ."

Automobile hazard #1 by policy definition is:

"(1) The ownership, maintenance or use (including loading and unloading) of any automobile for the purpose of garage operations and (2) the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the Named Insured and used principally in garage operations, and (3) the ownership, maintenance or use of any automobile owned by the Named Insured while furnished for the use of any person."

Garage operations are defined in the policy as the "ownership, maintenance or use of the premises for the purposes of a garage and all operations necessary or incidental thereto."

The garage policy also provides that:

"The insurance afforded under any other liability insurance made a part of this policy does not apply to garage operations, including the automobile hazard, for which insurance is afforded herein."

The first question is whether the U. S.F. & G. is an insurer of Johnson and Hearn, since American admits that it has coverage responsibility for Johnson if U.S.F. & G. provides only excess insurance or no insurance at all.

If the use of the truck by Johnson is a garage operation, then that portion of the policy must be examined first. Johnson qualifies under the garage policy as an insured, since he was using the truck with the permission of the named insured, Angstman. This assumes, of course, that Johnson's use of the truck was within the scope of the permission

given. The scope of permission will be considered later.

The exclusions from the definition are not applicable under these facts. The only possible exclusion under the garage policy for automobile hazard liability deals with the use by the insured of an automobile as a public livery conveyance or for carrying property for a charge. Whether this exclusion applies is immaterial. If it does not apply here, the garage policy provides liability coverage for Johnson as an insured and, disregarding the permission issue, for Hearn. If the garage policy applies, then the auto policy does not, since, as noted, the former policy provides that if it applies other liability portions of the policy do not apply.[3]

If this exclusion in the garage policy does apply here, or if the use of the truck does not meet the definition of "garage operation", then coverage is available for Johnson under the auto policy, assuming again that the scope of permission was not exceeded. Under that part of the policy, Johnson is an insured because he was using an automobile owned by the named insured, Angstman, with the permission of Angstman. Thus, U.S.F. & G. is obligated to pay the damages for which Johnson, as an insured, becomes liable as a result of bodily injury or property damage caused by an occurrence arising out of the use of any automobile. In this portion of the policy there is no exclusion for use of an automobile as a public livery or in carrying property for a charge. Likewise, none of the other exclusions of the auto policy apply under these facts.

Therefore, U.S.F. & G. is an insurer of Johnson under the policy, if he was acting within the scope of his permission to use the vehicle. In regard to the degree of permission granted Johnson by Angstman, U.S.F. & G. argues that the use of the truck by Hearn was outside

---

3. Contrary to U. S. F. & G.'s argument, this clause clearly prevents double coverage under the policy, but does not eliminate coverages under other portions of the total policy simply because the terms of the garage policy make that portion inapplicable.

the scope of permission. The basis for this argument is (1) that Hearn could not be a permittee since Montana public policy demands that a 15-year old unlicensed driver not be allowed to drive without a permit and without adult supervision; (2) that, since Angstman was not told that Hearn would operate the vehicle, Angstman excluded Hearn by law from operating the truck unless he complied with Montana requirements for unlicensed drivers; and (3) the use of the truck in the harvest operations was beyond the scope of trying out the vehicle.

In reply, American argues that, regardless of Montana law pertaining to unlicensed drivers, Hearn was not prevented from being a permittee and Angstman cannot be found to have impliedly refused to allow an unlicensed driver to use the truck. With regard to the issue of non-permittee by law, there appears to be a split of authority with no Montana decisions specifically in point. Defendant cites 7 Am.Jur.2d, Automobile Insurance, § 116 in support of his position. However, even the passage from this source quoted in U.S.F. & G.'s brief notes the split of authority and indicates that the majority of jurisdictions have held that lack of a driver's license does not prevent a second permittee from being within the scope of permission, absent a stated restriction in this regard.

American cites several cases in support of this position: International Service Insurance Co. v. Ballard, Miss., 216 So.2d 535 (1968); Allstate Insurance Co. v. Fidelity & Casualty Co. of New York, 73 N.J.Super. 407, 180 A.2d 168 (1962); Wood v. Kok, 58 Wash.2d 12, 360 P.2d 576 (1961); Odden v. Union Indemnity Co., 156 Wash. 10, 286 P. 59 (1930). In *Wood,* the Washington Supreme Court specifically held that the owner of the car did not make an implied restriction that the first permittee, who was trying out the car before buying it, not allow an unlicensed driver to operate the loaned vehicle.

As noted, the Montana Court has not dealt with this specific issue. However, in Cascade Ins. Co. v. Glacier General Ins. Co., 156 Mont. 236, 479 P.2d 259 (1971), the Montana Supreme Court had occasion to construe an omnibus clause. That clause extended coverage under the policy to "any person using automobile with consent of the named insured." 156 Mont. at 237, 479 P.2d at 259.

Mrs. Roark was the named insured on the policy. Her son was listed as the principal user of the vehicle in question and the premium for the policy was increased accordingly. Mrs. Roark told her son not to loan out the car while he was at college. Roark, however, allowed Daniels, his college roommate, to drive the car contrary to instructions. Daniels was involved in an accident while operating this vehicle. A declaratory judgment action was filed to determine which carrier had coverage and defense responsibilities. The trial court found that Roark

". . . controlled and had broad dominion over the automobile; that no restrictions were placed upon the scope of permission or use of the automobile and as a matter of law Douglas Daniels had permission to use the automobile owned by Betty Roark at the time and place of the accident;
. . . . ."

156 Mont. at 238, 479 P.2d at 260.

With regard to the issue of whether Daniels was an insured under the Roark policy, the court relied on Judge Jameson's opinion in National Farmers Union Property & Casualty Co. v. State Farm Mutual Auto. Ins. Co., 277 F.Supp. 542 (D.Mont.1967). The court adopted the theory of broad coverage under an omnibus clause and stated:

"Each case must be examined on its own facts, considering the extent of the dominion granted to the first permittee, together with the reasonable foreseeability of the particular use to which such permittee puts the auto-

mobile." 156 Mont. at 243, 479 P.2d at 262.

■ Applying the facts of this case to that ruling, it is clear that the broad scope of the omnibus clause, adopted by the Montana court, extends coverage to Hearn. Johnson was given permission to try the vehicle out. Battleson knew that Johnson was harvesting and that he needed a truck to replace a truck which had broken down. Moreover, Battleson testified in his deposition that he did not know whether Johnson or someone else would use the truck, but that it made no difference because Johnson was good for the truck. Deposition of Battleson, pp. 11–12.

Thus, Johnson was considered by Battleson to have had full dominion over the use of the truck while he had possession of it, and it was not unforeseeable to Battleson that a third party might use the vehicle.

Because of the Montana Court's adoption of the rule of broad coverage under the omnibus clause and its extension to the facts of this case, it is the opinion of this court that Montana would not withdraw coverage from Hearn, either as a matter of law or by implying a restriction by Angstman on the scope of permission, because he was not in compliance with Montana law.

■ As noted before, Battleson knew that the truck would be used to haul wheat. To Battleson it was immaterial whether Johnson or one of his employees used the truck. Clearly this brings the actual use of the vehicle within the scope of permission. In addition, it is consistent with the purpose of trying out the vehicle, that the prospective buyer test that vehicle by using it for the purpose for which it is to be purchased. Hence Johnson's use of the vehicle to haul wheat did not exceed the scope of his permission to test the vehicle. Therefore, the arguments of U.S.F. & G. that Johnson and Hearn were not per-

missive users under the policy must fail.[4]

■ U.S.F. & G. argues that, even if it has coverage responsibility for Hearn, it has no coverage responsibility for Johnson. In support of this theory, U. S.F. & G. argues that the omnibus clause, through the definition of insured, provides coverage only to the person who is actually operating the vehicle under the permission of the named insured. Since Hearn was the operator, only he can be covered. Johnson is not covered since the policy does not extend coverage to a nonoperator, even though he may be vicariously liable for the acts of the actual operator. U.S.F. & G. also notes that the policy specifically does not include language, like that contained in the policy in *Cascade,* upon which coverage for vicarious liability can be based. Absence of such language is alleged to preclude coverage of Johnson for vicarious liability.

The U.S.F. & G. policy includes as an insured in the policy:

"(c) Any other person while using an owned automobile or a hired automobile with the permission of the Named Insured, provided his actual operation or *(if he is not operating)* his *other actual use* thereof is within the scope of such permission, . . . ." Comprehensive Automobile Liability Insurance (Emphasis supplied.)

and

"(3) With respect to the automobile hazard:

(a) any person while using, with the permission of the Named Insured, any automobile to which the insurance applies under the automobile hazard, provided his actual operation or *(if he is not operating)* his *other actual use* thereof is within the scope of such permission, . . . ."

Garage Insurance (Emphasis supplied).

4. U. S. F. & G. also argues that Johnson and Hearn were not permissive users because Johnson owned the truck. This argument is disposed of by the finding that Angstman owned the truck.

In regard to use and actual operation, both portions of the policy are identical. As seen previously, the use to which the truck was put was within the scope of Angstman's permission. While Johnson was not himself operating the truck, it was being put to a use for his benefit, that is, hauling grain in order to determine whether the truck was suitable for that purpose. It is clear, therefore, that the policy extends coverage to Johnson even though he was not actually operating the truck since it was operated for his use and since the actual use was within the scope of his permission. Liberty Mutual Ins. Co. v. United States Fidelity & Guaranty Co., 232 F.Supp. 76, 80 (D.Mont.1964).

Moreover, both portions of the policy contain the following definition of insured:

". . . any other person or organization but only with respect to his or its liability because of acts or omissions of an Insured under [the previously discussed clauses]."

Clearly this extends coverage to Johnson for any vicarious liability due to the acts of his employee Hearn.

### III.

U.S.F. & G. argues that Johnson's American policy covers both Johnson and Hearn. American admits that its policy extends coverage to Johnson if there is no other collectible insurance. Having decided that the U.S.F. & G. policy affords coverage to Johnson and Hearn, the next issue for determination is which policy provides primary coverage and whether there is excess coverage from the other policy.

In the Master Insurance Policy, Division II—Liability Coverage, U.S.F. & G. provides in Condition 6., Other Insurance:

"The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance."

The only restriction on the primary quality of the U.S.F. & G. auto policy is listed in VI—Additional Condition:

"Excess Insurance—Hired and Non-Owned Automobiles

"With respect to a hired automobile or a non-owned automobile, this insurance shall be excess insurance over any other valid and collectible insurance available to the Insured."

Because of the court's ruling in regard to the ownership issue, the non-owned exclusion does not apply. The hired automobile by policy definition is an automobile not owned by the named insured. Since Angstman owned the truck, this provision is also not applicable. Thus, by the policy terms, if the auto policy applies, U.S.F. & G. is obligated as the primary carrier for both Johnson and Hearn.

The garage policy contains no limitations on the primary nature of the policy. Consequently, unless some aspect of the American policy requires the contrary, U.S.F. & G. is the primary carrier for Johnson and Hearn in this instance, regardless of whether the Comprehensive Automobile Liability Insurance or the Garage Insurance portions of the policy are applicable.

American's policy issued to Johnson provides under the Other Insurance section of Conditions:

"If at the time of an occurrence there is any other insurance available to the insured (in this or any other carrier) there shall be no insurance afforded hereunder as respects such occurrence except that if the applicable limit of liability of this policy is in excess of the applicable limit provided by the other insurance available to the insured this policy shall afford excess insurance over and above such other insurance in an amount sufficient to

afford the insured a combined limit of liability equal to the applicable limit of liability afforded by this policy. It is further provided that with respect to loss arising out of the operation, maintenance or use of any non-owned automobile the applicable insurance afforded by this policy shall be excess over and above such other available insurance. Insurance under this policy shall not be construed to be concurrent or contributing with any other insurance which is available to the insured; . . ."

■ The American policy also provides that American will pay on behalf of the insured all damages for bodily injury and property damage which the insured becomes "obligated to pay by reason of the liability imposed upon him by law or the liability of others assumed or retained by him under any written contract; . . . ." Thus, American has coverage for any damages for which Johnson is found to be liable. This coverage, due to the Other Insurance provision, is excess.

■ The American policy under its definition of Insured excludes Hearn from coverage. This term means the named insured, Johnson, and any other person using an automobile *owned or hired by the named insured* within the scope of permission given. Because Johnson did not own or hire the truck, Hearn is not covered by American under this portion of the policy. No other provision in the policy affords coverage to an employee of the named insured when using an automobile not owned by the named insured.

Since American affords no coverage to Hearn under these facts, U.S.F. & G. has exclusive coverage responsibility for Hearn. U.S.F. & G. also has primary coverage responsibility for Johnson. However, because the automobile involved was not owned by Johnson, American, under its policy terms, provides excess coverage to the full limit of its liability insofar as Johnson is concerned. As a result, U.S.F. & G. provides $100,000/$300,000 coverage for Johnson and Hearn. American provides $50,-000/$100,000 excess coverage for Johnson and no coverage for Hearn.

## IV.

■ Having determined the amount of coverage for which each carrier is responsible, the next issue before the court is which carrier has the obligation of providing a defense. Because only U.S.F. & G. provides coverage for Hearn, only U.S.F. & G. has any duty to defend Hearn. Thus, U.S.F. & G. must bear all the costs of Hearn's defense. The question is more difficult with regard to defense of Johnson.

There are no Montana cases deciding this question. This court dealt with the issue in *Liberty Mutual, supra.* There Judge Jameson noted that there were two theories in resolving this type of question:

"On the one hand, it has been held that where two companies insure the same risk and the policies provide for furnishing the insured with a defense, neither may require contribution from the other; that the duty to defend is personal to each insurer, and that neither is entitled to divide that duty with the other. [Footnote omitted.]

"On the other hand, many courts have held that defense expenses should be shared prorata." [Citations omitted.] 232 F.Supp. at 84.

Judge Jameson decided that, since Montana had not decided the issue, it was appropriate to follow the Ninth Circuit rule and to prorate the expenses of defense, including attorney fees, on the basis of the coverage provided by the policies of the respective carriers.

Admittedly, this decision does not deal with which carrier must actually make the arrangements for defense. American argues that, logically if U.S.F. & G. has primary coverage responsibility, it should have primary defense duty. State Farm Mut. Auto. Ins. Co. v. Foundation Reserve Ins. Co., 78 N.M. 359, 431 P.2d 737 (1967); National Farmers Union Property & Cas. Co. v. Farmers Ins. Group, 14 Utah 2d 89, 377 P.2d 786 (1963).

■ From a practical standpoint, U.S.F. & G. provides primary coverage of $100,000/$300,000. This coverage must be exhausted before the excess carrier is obligated to contribute to a judgment. U.S.F. & G. has the initial interest and, therefore, the initial duty to defend. Under Judge Jameson's ruling, however, regardless of the outcome of the case or the amount of judgment or settlement, if any, American must contribute its prorata share of the defense costs. Thus, because American provides $100,000 maximum coverage of the total available maximum coverage of $400,000, American must pay one-fourth of the cost of Johnson's defense.

## V.

■ The final question before the court is a collateral issue—whether Johnson is entitled to recover his attorney fees and costs from American. American admits that if U.S.F. & G. does not cover Johnson, then it does. Johnson has nothing at stake, therefore, in this matter. Rather, this is solely a suit between American and U.S.F. & G. to determine the duties and responsibilities of each.

American in Section II(e) of the Insuring Agreements in its policy with Johnson agrees to reimburse him for loss of wages or salary, not in excess of $25 per day for attendance at hearings or trials in connection with occurrences for which they provide insurance, and to pay all reasonable expenses which the insured incurs at the request of American.

Johnson seeks $25.00 for lost wages or salary while in attendance at the taking of his deposition. It is not clear whether Johnson lost actual wages or salary or whether he lost "other income." If the latter is the case, the policy excludes payment for such loss.

Johnson also asks the court to award him $1500 attorney fees under the theory that these are reasonable costs incurred at the request of the company. The court agrees that Johnson is entitled to recover *reasonable* attorney fees

under the theory of Standard Accident Ins. Co. of Detroit v. Hull, 91 F.Supp. 65 (S.D.Cal.1950). As Johnson notes in his brief, American has, by naming him as party defendant, *required* that Johnson make an appearance in a case which involves only the duties of the opposing carriers. Johnson's rights are in no way affected. Therefore, his presence in the law suit is not necessary.

On an equitable basis it is not just for American to avoid payment of expenses which Johnson has been required to expend, by arguing that they were not "requested" or on the legal nicety that "attorney's fees" are not expenses. Johnson contracted for insurance. American admits it covers him. The question of which carrier must cover Johnson is collateral to any duties owed by American to Johnson. Thus, American must pay Johnson's reasonable attorney's fees.

However, sufficient information is not before the court to enable it to determine what constitutes the amount of reasonable attorney's fees. If the parties cannot agree on what amount Johnson is required to be paid, additional information should be submitted to the court for this determination.

Based upon the above findings,

It is ordered that the motion for summary judgment of American States Insurance Company is granted, and the counter motion of United States Fidelity and Guaranty Company is denied in the following particulars:

1. The 1952 Chevrolet truck was owned by defendant Angstman Motors Inc., at the time of the accident;

2. Defendant United States Fidelity and Guaranty Company provides primary coverage for defendant Johnson and defendant Hearn;

3. Plaintiff American States Insurance Company provides excess insurance for defendant Johnson in the full amount of its policy limits;

4. Plaintiff American States Insurance Company is not an insurer of defendant Hearn;

5. Defendant United States Fidelity and Guaranty Company has the respon-

sibility of providing a defense for its insureds, defendant Johnson and defendant Hearn; and

6. Plaintiff American States Insurance Company must contribute to the defense of defendant Johnson, but not defendant Hearn, prorated on the basis of the coverage provided by its policy, that is, in an amount equal to one-fourth of Johnson's defense costs.

It is further ordered that defendant Johnson's motion for summary judgment is granted and plaintiff American States Insurance Company's motion for summary judgment is denied to the extent that plaintiff American is required to pay defendant Johnson for wages or salary lost due to his attendance at hearings and reasonable attorney's fees and other costs. As noted, if the parties involved cannot agree upon this amount, additional information should be submitted to the court in accordance with this opinion.

It is further ordered that the clerk of this court enter judgment in accordance with this order.