**AMERICAN SIMMENTAL ASSOCIATION, a Montana Non–Profit Association, Plaintiff,**

v.

**COREGIS INSURANCE COMPANY, an Indiana Corporation, Defendant/Third Party Plaintiff,**

v.

**St. Paul Fire & Marine Insurance Company, a Minnesota Corporation, Defendant/Third Party Defendant.**

No. 4:98CV3327.

United States District Court, D. Nebraska.

July 25, 2000.

R. Murray Ogborn, Ogborn, Summerlin Law Firm, Lincoln, NE, for Plaintiff.

William R. Johnson, Lamson, Dugan LLP, Omaha, NE, Jeffrey A. Goldwater, Robert S. Marshall, Matthew J. Fink, Bollinger, Ruberry Law Firm, Chicago, IL, for Defendant/Third Party Plaintiff.

P. Shawn McCann, Sodoro, Daly Law Firm, Omaha, NE, Rebeca R. Haller, Vineet Gosain, Oppenheimer, Wolff Law Firm, Chicago, IL, Bethany K. Culp, David W. Wilk, Oppenheimer, Wolff Law Firm, St. Paul, MN, for Defendant/Third Party Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

The American Simmental Association (ASA) brings this action against two of its insurers, Coregis Insurance Company and St. Paul Fire & Marine Insurance Company. As against St. Paul, the ASA seeks a declaration that St. Paul breached its duty to defend the ASA in a lawsuit brought against it—known as the Blue Dane Litigation—and whether St. Paul has a responsibility to pay some or all of the defense costs the ASA incurred in defending the lawsuit after St. Paul refused to provide a defense. As against Coregis, the ASA seeks recovery of defense costs and expenses incurred in the Blue Dane Litigation that have not already been paid by Coregis. Coregis brings a third-party claim against St. Paul seeking contribu-

tion, indemnity, subrogation, and declaratory relief with regard to the amount of the Blue Dane defense costs that Coregis was forced to pay due to St. Paul's breach of its duty to defend the ASA.

Because the ASA and Coregis have settled the dispute between them prior to the bench trial in this matter, and because the court has previously determined that St. Paul breached its duty to defend the ASA in the Blue Dane Litigation, remaining for the court's consideration are these general issues: the scope of St. Paul's duty to reimburse the ASA and/or Coregis for St. Paul's breach of its duty to defend the ASA; whether the ASA and Coregis are entitled to prejudgment interest; and whether the ASA and Coregis are entitled to attorneys' fees and expenses for bringing this action against St. Paul. (Filing 87, Joint Order on Pretrial Conf. at 4–5.) Following a bench trial on the merits of this case, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1]

## I. FINDINGS OF FACT

### The Parties

1. The ASA is a non-profit corporation organized and existing under the laws of the State of Montana, with a principal place of business in Bozeman, Montana. The ASA does business in all 50 of the United States. (Joint Order on Pretrial Conf. ¶ 3.)

2. Coregis Insurance Company, formerly known as Mount Airy Insurance Company, is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business in Chicago, Illinois. (Joint Order on Pretrial Conf. ¶ 4.)

3. St. Paul Fire & Marine Insurance Company is a corporation organized and existing under the laws of the State of Minnesota, with a principal place of business in Minnesota. St. Paul does business

---

1. Any finding of fact more properly characterized as a conclusion of law, and any conclu-

sion of law more properly deemed a finding of fact, should be so construed.

in all 50 of the United States. (Joint Order on Pretrial Conf. ¶ 5.)

4. The ASA's principal business is the registration and recordation of performance data on Simmental cattle in North America. (Joint Order on Pretrial Conf. ¶ 6.)

*The Insurance Policies*

5. On or about October 1, 1991, St. Paul issued to the ASA an insurance policy which included commercial general liability insurance with personal injury and advertising injury coverage. The St. Paul policy was issued with policy number RP06615500, effective from October 1, 1991, through October 1, 1992. The policy was then renewed and in effect from October 1, 1991, through October 1, 1993. The policy was again renewed and a third policy was in force from October 1, 1993, through October 1, 1994. (Joint Order on Pretrial Conf. ¶ 7.) For purposes of this case, there are no material differences between the St. Paul policies (hereinafter "policy"). (Ex. 1; Ex. 2.)

6. The St. Paul policy provides liability insurance to the ASA and its officers, directors, and employees for covered acts or omissions done within the course and scope of the ASA's activities. (Ex. 1 at E–68.)

7. The St. Paul policy provides that St. Paul will "pay amounts any protected person is legally required to pay as damages for covered ... advertising injury that's caused by an offense committed while this agreement is in effect." (Ex. 1 at E–66.) "Advertising injury" is defined in the policy as "injury caused by any of the following offenses that result from the advertising of your products or work ... unauthorized taking of advertising ideas or style of doing business; [or] infringement of copyright, title or slogan." The policy does not define "advertising." (Ex. 1 at E–66 to –67.) The St. Paul policy excludes from coverage "advertising injury that results from written or spoken material made public by or for the protected person if the material is known by that person to be false." (Ex. 1 at E–76.)

8. The St. Paul policy provides that St. Paul has "the right and duty to defend any claim or suit for covered injury or damage made or brought against any protected person." (Ex. 1 at E–67.) The St. Paul policy also contains an ."other insurance" provision which states in part:

This agreement is primary insurance. If there is other valid and collectible insurance for injury or damage covered by this agreement, the following applies:

**Primary insurance.** When there is other primary insurance, we'll share any damages with that insurance using one of the methods of sharing described below [contribution by equal shares or by limits]. However, this agreement will be excess insurance over any part of any other insurance which provides ... property or similar coverage for damage to your work ....

**Excess insurance.** When this agreement is excess insurance ... [w]e'll have no duty to defend any claim or suit. However, we'll defend a claim or suit for covered injury or damage if the other insurers won't. In return we'll require that the protected persons give us all of their rights against those insurers.

(Ex. 1 at E–77 to—78.)

9. On January 16, 1994, Coregis Insurance Company issued a claims-made and reported Non–Profit Organization Liability Insurance Policy to the ASA, with effective dates from January 16, 1994, to January 16, 1995, Policy No. 524–189304–9. (Joint Order on Pretrial Conf. ¶ 8.)

10. The Coregis policy does not contain a duty to defend the ASA, but provides that Coregis "will pay on behalf of the Insureds all Loss which the Insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period." (Ex. 20 at 10.) "Loss," as used in the above provision, is defined as:

*any amount which the Insureds are legally obligated to pay* or which the Entity shall be required, or permitted by law to pay as indemnity to the Insureds, for any claim or claims made against them, for Wrongful Acts *and shall include but not be limited to* damages, judgments, settlements and costs, *cost of investigation and defense of legal actions* (excluding from such cost the salaries of officials or employees of the Entity), claims or proceedings and appeals therefrom, cost of attachment or similar bonds; provided always, however, such subject of loss shall not include fines or penalties imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

(*Id.* (emphasis added).) Further, the Coregis policy defines "Wrongful Act" as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by one or more of the individual Insureds while acting in their capacity as an authorized representative of the Entity, subject to the further terms, conditions and limitations of this policy." (*Id.*) The Coregis policy excludes from coverage claims made against the ASA "based upon or arising out of . . . [a] publication or utterance in the course of or related to advertising . . . activities conducted by or on behalf of [the ASA]." (Ex. 20 at 11.)

11. The Coregis policy contains an "other insurance" provision which states, "If the Entity or any Insured has other insurance insuring against a Loss covered by this Policy, the insurance provided by this Policy shall apply in excess of such other insurance." (Ex. 20 at 14.) The Coregis policy also contains a "subrogation" clause which provides that "[i]n the event of any payment under this Policy, the Company shall be subrogated to all the Insureds' rights of recovery therefore against any person or organization and the Insureds shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights.

The Insureds shall do nothing after Loss to prejudice such rights." (*Id.* at 13.)

12. The ASA paid all premiums and performed all conditions precedent under the St. Paul policy and Coregis policy. (Joint Order on Pretrial Conf. ¶ 21.)

### The Underlying Litigation

13. On April 14, 1994, Blue Dane Simmental Corporation, Roland Nuss, Ronald Vlasin, and Dennis Behrhorst filed their initial Complaint against the ASA, Tom Risinger, and John Doe in the United States District Court for the District of Nebraska in what has become known as the "Blue Dane Litigation," *Blue Dane Simmental Corp., et al. v. American Simmental Ass'n. et al.,* No. 4:CV94–3116 (D.Neb.). (Joint Order on Pretrial Conf. ¶ 9.)

14. The Blue Dane Complaint alleged that the ASA improperly designated two of defendant Risinger's Simmental bulls (bulls which had been imported from Germany to England) as "fullblood" Simmentals and that the ASA published advertisements that falsely represented the genetic makeup of those animals. The initial Complaint alleged causes of action for racketeering and restraint of trade. (*See generally* Ex. 3.)

15. More specifically, the initial Complaint in the Blue Dane Litigation alleged that the underlying plaintiffs were members of the ASA and Simmental breeders. The plaintiffs alleged that the ASA was the "only entity which registers and promotes the Simmental Breed of cattle in the United States." Under the ASA bylaws, the underlying plaintiffs allegedly had rights and interests with respect to the ASA and its property. In 1991, the ASA allegedly amended its bylaws to provide the designation of 'fullblood' to cattle with foreign ancestry. On April 15, 1992, the ASA registered the Risinger cattle as "fullbloods." The defendants allegedly designated the Risinger cattle as "fullbloods," despite the defendants' knowledge that the animals were not "fullbloods" be-

cause they contained Angus genetics. The ASA allegedly began "marketing" the cattle as "fullbloods" and "attempt[ing] to cover up the impact of the Angus genetics." (Ex. 3 at ¶¶ 2–4, 10, 15, 17, 30, 37, 39, 40.) *See American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d 1023, 1026 (D.Neb.1999).

16. The initial Complaint alleged that in August 1992, Risinger and the ASA allegedly published advertisements in the Register (the official publication of the ASA) indicating that the Risinger cattle were 100 percent Fleckvieh (German for "Simmental") genetics. The plaintiffs alleged that the representations made by the defendants· in that advertisement were false and that the defendants' "fraudulent" representation of the Risinger cattle as "fullbloods" caused the value of their fullblood animals to diminish by at least 50 percent. The plaintiffs sought damages of $1,583,200.00, trebled, as well as costs and attorneys' fees. (Ex. 3 at ¶¶ 41, 51 & Prayer for Relief.) *See American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1026.

17. On April 18, 1994, the ASA tendered the Blue Dane Complaint to St. Paul, requesting that St. Paul provide a defense to the action and coverage of any loss arising from the Blue Dane Litigation. By letter dated May 5, 1994, St. Paul denied that it had a duty to defend or to indemnify with respect to the Blue Dane Litigation. The ASA also tendered the Blue Dane Litigation to Coregis. Coregis agreed to indemnify the ASA on an interim basis under a reservation of rights for 50 percent of the covered defense costs pending resolution of the Blue Dane Litigation at which time the allocation issue would be revisited. (Joint Order on Pretrial Conf. ¶¶ 10–12.)

18. The ASA employed defense counsel and directed its own defense of the Blue Dane Litigation. (Joint Order on Pretrial Conf. ¶ 13.)

19. On or about September 9, 1994, the Blue Dane Litigation plaintiffs filed an Amended Complaint. (Joint Order on Pretrial Conf. ¶ 14.) In addition to the claims brought in the initial Blue Dane Complaint, the Amended Complaint brought a claim against the ASA under the Lanham Act, 15 U.S.C. § 1125. (Ex. 4 ¶ 9; Filing 59, Ex. B ¶¶ 68–76.) There is no evidence that the Amended Complaint was tendered to either Coregis or St. Paul.

20. On or about October 7, 1994, the Blue Dane Litigation plaintiffs filed a Second Amended Complaint, which incorporated the Lanham Act allegations from the Amended Complaint and added a claim against the ASA for negligence. (Joint Order on Pretrial Conf. ¶ 15; Ex. 5 ¶¶ 77–86.) With regard to the Lanham Act, the plaintiffs alleged that at the time the defendants designated the animals with the title of "fullbloods," the defendants began the "advertisement," "promotion," and "representation" of the Risinger cattle as "fullbloods"; the ASA's statements as to the designation and title of the Risinger cattle were false because the Risinger cattle contained Angus genetics; the ASA's false advertising and promotion were disseminated to purchasers of Simmental genetics and Simmental breeders, who were actually deceived or tended to be deceived by the false advertising and promotion; the ASA's misrepresentation was likely to influence the purchasing decisions of those to whom the false advertising and promotion were disseminated; the defendants' misrepresentation injured the plaintiffs by causing them to lose customers and sales, resulting in business losses and impairment of the plaintiffs' ability to compete; and the defendants' misrepresentations, advertisements, and promotions would likely cause the plaintiffs irreparable harm by damaging their reputation as Simmental breeders, as well as the reputation of their Simmental genetics. (Ex. 5 ¶¶ 70–76.) *See American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1027.

21. The ASA tendered the Blue Dane Second Amended Complaint to St. Paul by letter dated April 4, 1996, requesting that St. Paul provide a defense to the action

and coverage of any loss arising from the Blue Dane Litigation. (Joint Order on Pretrial Conf. ¶ 16.) By letter dated August 28, 1996, St. Paul denied that it had any duty to defend or to indemnify with respect to the Blue Dane Litigation. (Joint Order on Pretrial Conf. ¶ 17.)

22. On May 31, 1997, the Blue Dane Litigation plaintiffs filed a Third Amended Complaint, which contained the same claims against the ASA as found in the Second Amended Complaint. (Joint Order on Pretrial Conf. ¶ 18; Ex. 6.) On June 26, 1997, the ASA tendered the Blue Dane Third Amended Complaint to St. Paul, requesting that St. Paul provide a defense to the action and coverage of any loss arising from the Blue Dane Litigation. (Joint Order on Pretrial Conf. ¶ 19.) By letter dated October 13, 1997, St. Paul denied that it had a duty to defend or to indemnify with respect to the Blue Dane Litigation. (Joint Order on Pretrial Conf. ¶ 20.)

23. The Blue Dane Litigation was tried to a jury in January 1998. (Joint Order on Pretrial Conf. ¶ 22.) Following the close of the plaintiffs' case, the ASA moved for and was granted judgment as a matter of law on all claims. (Joint Order on Pretrial Conf. ¶ 23.)

24. On appeal by the Blue Dane plaintiffs, the United States Court of Appeals for the Eighth Circuit affirmed the district court's judgment. (Joint Order on Pretrial Conf. ¶ 24.)

### The Present Litigation

25. The ASA first brought a claim against Coregis, seeking to recover the remainder of the fees and expenses incurred by the ASA in the defense of the Blue Dane Litigation. The ASA and Coregis settled their dispute prior to trial whereby Coregis conditionally agreed to reimburse the ASA a total of $1,109,830.73

for the costs incurred by the ASA in defense of the Blue Dane Litigation. Coregis has paid $809,830.73 of that amount to the ASA. (Joint Order on Pretrial Conf. ¶ 25; Ex. 17.)

26. The ASA also brought a claim against St. Paul, seeking a declaration that St. Paul breached its duty to defend the ASA in the Blue Dane Litigation. Coregis brought a third-party claim against St. Paul, seeking contribution, indemnity, subrogation, and declaratory relief with regard to the amount of the Blue Dane defense costs that Coregis was forced to pay due to St. Paul's breach of its duty to defend the ASA.

27. Plaintiff ASA's Exhibit 13 consists of the statements issued to the ASA for defense costs (including both attorney fees and expenses) incurred during the Blue Dane Litigation. Those statements total $1,251,911.06. (Exs. 13 & 15; Tr. 88–90.) Of that amount, the ASA has identified a total of $52,733.06 in fees and expenses that is included in Exhibit 13, but which was not related to the defense of the Blue Dane Litigation.[2] (Ex. 15.) The ASA does not seek to recover this amount. Rather, the defense costs for which the ASA and Coregis seek indemnification total $1,199,178.00. (Ex. 15.)[3]

## II. CONCLUSIONS OF LAW

The general issues remaining for disposition are the scope of St. Paul's duty to reimburse the ASA and/or Coregis for St. Paul's breach of its duty to defend the ASA; whether the ASA and Coregis are entitled to prejudgment interest; and whether the ASA and Coregis are entitled to attorneys' fees and expenses for bringing this declaratory judgment action

---

2. Among the fees excluded are those incurred prior to the ASA's tender of the Blue Dane initial Complaint to St. Paul on April 18, 1994. (Ex. 15.)

3. Exhibit 15 totals the invoices in Exhibit 13 and subtracts from that total amounts not

sought by the ASA in this lawsuit. Two invoices totaling $2,712.52 (Tr. 88–90) were not incorporated into the statement total in Exhibit 15 because they were added to Exhibit 13 at trial. Therefore, $2,712.52 must be added to the $1,196,465.48 total appearing in Exhibit 15, for a new total of $1,199,178.00.

against St. Paul. (Filing 87, Joint Order on Pretrial Conf. at 4–5.)

## A. SCOPE OF ST. PAUL'S DUTY TO PAY

On the parties' previous cross motions for summary judgment, I concluded that Montana law applies to the insurance coverage issue; that St. Paul breached its duty to defend the ASA under its policy's "advertising injury" coverage; and that, as a result, "ASA and Coregis are entitled to indemnity from St. Paul." *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1028 & 1032. However, I did not specifically state which complaint triggered St. Paul's duty to defend and when St. Paul breached that duty, questions relevant to my current task of determining the scope of St. Paul's liability to the ASA and Coregis.

### 1. St. Paul's Duty to Defend and Breach of that Duty

### a. Which Complaint Triggered St. Paul's Duty to Defend?

I begin with what is not at issue. The parties do not claim that St. Paul's duty to defend was triggered by the Blue Dane Amended Complaint, as there is no evidence that the ASA tendered that complaint to St. Paul. (*See* Coregis' Reply Br. at 2 ("The issue unresolved is whether the Original Complaint or the Third Amended Complaint triggered St. Paul's duty to defend.").) Further, whether the Second or Third Amended Complaints triggered St. Paul's duty to defend the ASA is also not at issue due to my resolution of the parties' cross motions for summary judgment, *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d 1023. While I cited allegations from the Blue Dane plaintiffs'

initial Complaint, Second Amended Complaint, and Third Amended Complaint in finding that St. Paul breached its duty to defend the ASA under the "advertising injury" provision of the St. Paul insurance policy, *id.* at 1025–27 & 1029–30, all of the provisions cited in the opinion which were essential to my conclusion were contained in the Second Amended Complaint. In other words, even though I referred to and cited language from the initial Complaint and Third Amended Complaint, these allegations were also present in the Second Amended Complaint.[4] Therefore, I have already determined that the Second Amended Complaint triggered St. Paul's duty to defend the ASA under the terms of the St. Paul policy,[5] and the relevant question now becomes whether the earlier-filed Blue Dane initial Complaint triggered St. Paul's duty as well.

In *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1028–29, I described Montana case law regarding an insurer's duty to defend and rules of insurance contract construction, which I need not repeat here. Applying those standards to the St. Paul policy at issue, I stated that "if it was claimed [by the plaintiffs] that the designation 'fullblood' was advertised by (or with the approval of) ASA, then ASA's 'products or work' were implicated." *Id.* at 1030. I concluded that the "advertising injury" language that limits coverage to offenses resulting from the advertising of "your products or work" encompassed the Blue Dane Litigation because the "plaintiffs attacked advertisements directly attributed to ASA regarding the designation 'fullblood,' which designation was a 'product or work' of ASA." *Id.* at 1029.

---

4. The only cited portion of the Third Amended Complaint that was not contained in the Second Amended Complaint is the allegation that "ASA required that all advertisements regarding the 'pedigree' of animals 'conform to records kept by the [ASA].'" *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1030. (*Compare id.* at 1025–27 & 1029–30; Filing 59, Exs. A, C, D (com-

plaints cited in summary judgment opinion); Exs. 3, 5, 6 (exhibits from bench trial).)

5. Because St. Paul's duty to defend was triggered by the Second Amended Complaint, it is irrelevant whether the later-filed Third Amended Complaint also triggered St. Paul's duty.

As did the Second and Third Amended Complaints discussed in *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1029–30, the initial Complaint alleged that the ASA "is the only entity which registers and promotes the Simmental Breed of cattle in the United States"; the ASA's primary objective is "the development, registration and promotion of the simmental breed of cattle in the United States of America"; "it is the duty of the [ASA] to furnish proper certificates of registry"; on April 15, 1992, "the ASA and Risinger registered [Risinger's animals] as fullblood simmentals and issued registration certificates" in spite of their knowledge that the animals were not fullblood simmentals; in August 1992 "the ASA and Risinger published advertisements in *The Register* about [Risinger's animals]" indicating that the animals were "100 percent [simmental]," a "representation . . . that . . . was false"; and *The Register* "is the official publication of the ASA." (Ex. 3, Blue Dane Complaint ¶¶ 10, 14, 30, 37, 41.)

Thus, the allegations in the Blue Dane initial Complaint "implicated ASA's product or work (the label 'fullblood') and these allegations asserted that ASA caused the 'fullblood' advertising." *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1030. The question then becomes whether the "advertising injury" claimed by the Blue Dane plaintiffs in the initial Complaint arose from the "unauthorized taking of advertising ideas or style of doing business" or "infringement of copyright, title or slogan." (Ex. 1 at E–66 to –67.)

■ In *American Simmental Ass'n v. Coregis Ins. Co.*, I concluded that St. Paul had a duty to defend under both the "unauthorized taking" and "infringement" provisions of its "advertising injury" coverage because the Blue Dane "pleadings" alleged:

The plaintiffs had a special right to use and advertise the ASA designation "fullblood" because they were members of the ASA and because they were true "fullblood breeders."

The "fullblood" designation, being a term of art under the ASA policies, carried with it unique economic value in the hands of the rightful users. The market attached particular significance to that designation, especially when used in advertisements, because the ASA was the only Simmental breeding association in the United States.

ASA wrongfully bestowed the "fullblood" designation on the Risinger cattle, animals that were not entitled to it. By advertising the improper grant of "fullblood" status to the Risinger cattle in the ASA's magazine and elsewhere, ASA diminished the value of the distinctive label "fullblood" in the hands of the rightful users, the Blue Dane plaintiffs.

*American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d at 1030–31. Based on these allegations and Montana rules of insurance contract construction, I concluded:

Thus, it is correct to say that the Blue Dane plaintiffs in effect claimed that the "fullblood" designation was a unique "advertising idea," a "style of doing business," a "title" or "slogan." They also essentially claimed that the designation rightfully belonged to them as members of the ASA and as fullblood breeders. Finally, they basically claimed that ASA, in part through its advertising, usurped (took) or impinged upon (infringed) the fullblood designation in their hands, causing them damage.

*Id.* at 1031.

Because the Blue Dane initial Complaint contains all of the factual allegations necessary to my previous conclusion that the Second Amended Complaint triggered St. Paul's duty to defend, I likewise conclude that the facts alleged in the initial Complaint triggered that duty. (*See* Ex. 3, Blue Dane Complaint ¶¶ 1–4, 10, 14, 15, 30, 37, 41, 51, 52.) *See Grindheim v. Safeco Ins. Co.*, 908 F.Supp. 794, 798 (D.Mont. 1995) (insurer's duty to defend its insured arises when insurer receives notice "of *facts* representing a risk covered by the terms of the policy," as reflected in plead-

ings, discovery, or issues ready for trial; insurer's duty to defend arises when complaint "alleges *facts,* which if proven, would result in coverage") (emphasis added); *Lindsay Drilling & Contracting v. United States Fidelity & Guar. Co.,* 208 Mont. 91, 94–95, 676 P.2d 203, 205 (1984) (insurer's duty to defend exists "if the counterclaim sets forth *facts* which represent a risk covered by the terms of the insurance policy"; question is whether "[t]he policy covers this *set of alleged facts* ") (emphasis added); *Atcheson v. Safeco Ins. Co.,* 165 Mont. 239, 245–46, 527 P.2d 549, 552 (1974) (same).

### b. *Triggering and Scope of Duty to Defend*

▮ Under Montana law, an insurer's duty to defend its insured is "triggered" when "the insured, or someone on the insured's behalf, tenders the defense of an action potentially within the policy coverage." *Grindheim,* 908 F.Supp. at 798. In the case now before me, an attorney on the ASA's behalf tendered to St. Paul the initial Blue Dane Complaint on April 18, 1994, requesting that St. Paul provide a defense to the action and coverage of any loss arising from the ensuing litigation. (Ex. 7; Joint Order on Pretrial Conf. at 2 ¶ 10.) As stated above, that initial Complaint contained facts representing a risk covered by the terms of St. Paul's policy. Therefore, St. Paul's duty to defend the ASA in the Blue Dane Litigation was triggered upon tender of the initial Complaint on April 18, 1994.

▮ St. Paul argues that despite the triggering of its duty to defend, it should not be held liable for the full cost of defending the Blue Dane Litigation because the St. Paul policy did not provide coverage for all of the claims asserted in the Complaint. Under Montana law, an insurer that breaches its duty to defend, as St. Paul did here, will be held liable to its insured for attorney fees, expenses, and court costs resulting from the breach, despite the fact that the complaint that triggers such duty contains claims outside the insured's coverage. *Grindheim,* 908

F.Supp. at 802 n. 10 & 808 (insurer's duty to defend complaint is triggered, even when only portion of complaint alleges facts that, if proven, would result in coverage; insurer that breached duty to defend liable to insured for all damages sustained as result of breach); *Truck Ins. Exchange v. Woldstad,* 212 Mont. 418, 423, 687 P.2d 1022, 1025 (1984) (insurer's breach of contractual duty to defend renders insurer liable for attorney fees and defense costs resulting from such breach); *Atcheson v. Safeco Ins. Co.,* 165 Mont. at 245–46, 527 P.2d at 552 (when complaint alleges facts representing risks both inside and outside coverage of policy, insurer has duty to defend); *Home Ins. Co. v. Pinski Bros., Inc.,* 160 Mont. 219, 227–28, 500 P.2d 945, 950 (1972) (when insurer breached duty to defend lawsuit against its insured, court held insurer liable for attorney fees, expenses, and court costs incurred by insured in defending himself against both covered and uncovered claims); R.D. Hursh, Annotation, *Refusal of Liability Insurer to Defend Action Against Insured Involving Both Claims Within Coverage of Policy and Claims Not Covered,* 41 A.L.R.2d 434 § 3(b) (1955) ("A liability insurer is liable to the insured for his expenses in defending an action against him based upon claims falling both within and without policy coverage, where the insurer has failed to defend the action notwithstanding a policy provision requiring the insurer to defend actions on claims covered by the policy.") (cited with approval in *Home Ins. Co. v. Pinski Bros., Inc.*).

Thus, Montana law provides that St. Paul is liable for the ASA's attorney fees, expenses, and court costs incurred in defending itself against all claims included in the Blue Dane Litigation as of the date of the ASA's tender of the initial Complaint to St. Paul on April 18, 1994, and there is no reason to consider allocation of St. Paul's liability based on "covered" and "noncovered" claims. *See Home Ins. Co. v. Pinski Bros., Inc.,* 160 Mont. at 227–28, 500 P.2d at 950 ("In our view it would not be possible to separate or segregate"

claims covered by the insurance policy and those not within coverage, and "[e]ven if such were possible, [the insurer] has been the ... party whose wrongful acts made it necessary for [the insured] to defend themselves against both covered and noncovered claims ...."); Practising Law Institute, *Apportioning an Insurer's Liability Between Covered and Noncovered Parties and Claims,* 369 PLI/Lit 597, 599 n. 1 & 624 (1989) (Westlaw) ("It has been held that an insurer that wrongfully refuses to defend will automatically be liable for all of the insured's damages and defense costs and will be estopped from raising defenses to coverage. Under such circumstances, there is no longer an issue of allocation to be addressed."); some courts allocate defense expenses between covered and noncovered claims when such division is easily accomplished, but in complex situations, the insurer is required to "pay all defense costs provided some allegation in the complaint is arguably entitled to coverage for damages.").

### c. Coregis' Theories of Recovery

Coregis seeks indemnification, subrogation, or contribution [6] from St. Paul in the amount of $809,830.73, the amount Coregis has paid the ASA for the ASA's defense of the Blue Dane Litigation. (*See* Filing 8, Coregis' Third–Party Complaint Against St. Paul.) Coregis argues that (1) both Coregis and St. Paul had a duty to pay all of the defense costs incurred by the ASA in the Blue Dane Litigation from the time the initial Blue Dane Complaint was tendered; (2) although the Coregis and St. Paul policies do not cover the same risks of loss for indemnity purposes,[7] the policies contain concurrent obligations to pay the ASA for its defense costs; (3) when an insurer can establish that it is concurrent with another insurance policy, it is entitled to seek equitable contribution from that insurer; (4) when two insurance policies contain concurrent obligations, an analysis of each policy's "other insurance" clauses is necessary to establish the priority of the policies; (5) the Coregis policy contains an "excess other insurance" clause, and the St. Paul policy contains a "pro rata other insurance" clause; (6) in such circumstances, the majority view gives effect to the "excess other insurance" clause and holds the pro rata policy solely liable for the loss up to its policy limits, and the minority view ignores the presence of the "excess other insurance" clause and prorates the loss between the two policies; (7) because Montana has adopted the "majority view," Coregis' "excess other insurance" clause must be given effect, rendering the Coregis policy excess to the St. Paul policy; and (8) Coregis is therefore entitled to indemnity in the amount Coregis reimbursed the ASA for defense fees and costs which should have rightfully been paid by St. Paul as the primary insurer by operation of the "other insurance" clauses. (Coregis' Post–Trial Br. at 15–25; Coregis' Reply Br. at 9–15.)

In contrast, St. Paul asserts that (1) as between insurers, no right to equitable contribution exists when the insurance policies at issue do not cover the same risk or loss; and (2) because the Coregis and St. Paul policies do not provide coinsurance for the same risk, the court should disregard the "other insurance clauses" when deciding how the ASA's defense costs should be apportioned between the insurers. (St. Paul's Post–Trial Br. at 23–29; St. Paul's Reply Br. at 6–10.)

**6.** "It is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, contribution, co-obligation and joint tortfeasorship. It is also difficult to think of two legal concepts that have caused more confusion and headache for both courts and litigants than have contribution and subrogation. Although the concepts of contribution and subrogation are both equitable in nature, they are nevertheless distinct." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.,* 65 Cal.App.4th 1279, 1291, 77 Cal.Rptr.2d 296, 302 (1998) (internal citations and quotation marks omitted).

**7.** Specifically, the Coregis policy is an errors and omissions policy that indemnifies the insured for defense costs, while the St. Paul policy is a general liability policy containing a duty to defend.

 Montana case law has recognized the doctrines of equitable contribution and equitable subrogation as between insurers. *Casualty Indem. Exchange Ins. Co. v. Liberty Nat'l Fire Ins. Co.*, 902 F.Supp. 1235, 1237–38 (D.Mont.1995) (principle of equitable subrogation "well established" under Montana law; because equitable contribution between insurers is akin to general principle of equitable subrogation, district court was confident Montana Supreme Court would recognize doctrine of equitable contribution among insurers, "as developed in other jurisdictions").

### (i) Equitable Contribution

 In the indemnity setting, the doctrine of equitable contribution "permits an insurer, which has paid a claim, to seek contribution directly from other insurers who are liable for the same loss" and who insure the same risk. *Id.* at 1237–38. The doctrine is applied in cases where an insurer undertakes a common obligation of another insurer, and the "doctrine presupposes the existence of two or more contracts of insurance which render the respective insurers 'equally liable for the discharge of a common obligation.'" *Id.* at 1237–38 (quoting *Couch on Insurance Second* ¶ 62:151 (1983)).

 However, when contribution for defense costs is sought—as opposed to direct indemnification of the insured under the coverage provisions of a policy—the above "same risk" rule does not apply, and contribution for such defense costs "may be procured by one liability insurer from another even though the two do not cover the same risks," presuming that the defense costs were incurred in a proceeding implicating a risk covered by the insurer from whom contribution is sought. *Couch on Insurance* § 218:4 (3d ed.1999), § 62:162 (2d rev. ed.1999); *NL Indus., Inc. v. Commercial Union Ins. Co.*, 935 F.Supp. 513, 518–19 (D.N.J.1996) ("same risk" doctrine is "simply the definition of contribution in the indemnity setting" and is inapplicable when contribution for defense costs is sought by one insurer against another; it would be illogical and inequitable to deny

insurer its right to obtain contribution from another insurer when each had duty to defend, activated by different claims in the same underlying lawsuits).

While the parties have not cited, nor has the court found, a case involving an insurer with a duty to indemnify the insured for defense costs (like Coregis) that sought contribution or subrogation from an insurer that breached its duty to defend (like St. Paul), the courts of Montana have required, in contribution actions, proration of defense costs between insurers who shared the duty to defend, with such proration being based on the coverage afforded by the respective policies or upon actual dollars contributed in settlement of claims asserted against the common insured. *See Guaranty Nat'l Ins. Co. v. American Motorists Ins. Co.*, 758 F.Supp. 1394 (D.Mont. 1991), *aff'd*, 981 F.2d 1108 (9th Cir.1992); *American States Ins. Co. v. Angstman Motors, Inc.*, 343 F.Supp. 576 (D.Mont. 1972); *Liberty Mut. Ins. Co. v. United States Fidelity & Guar. Co.*, 232 F.Supp. 76 (D.Mont.1964). *See also Continental Cas. Co. v. Zurich Ins. Co.*, 57 Cal.2d 27, 366 P.2d 455, 17 Cal.Rptr. 12 (1961) (cited with approval in *Liberty Mut. Ins. Co.*, 232 F.Supp. 76).

*Guaranty Nat'l Ins. Co. v. American Motorists Ins. Co.*, 758 F.Supp. 1394 (D.Mont.1991), involved two "primary" policies—one of which became "excess" by virtue of an "other insurance" clause—that covered a common insured. Both of the policies contained duties to indemnify and defend. One of the insurers undertook the defense of the common insured, and both insurers contributed to the ultimate settlement. The insurer that defended the lawsuit against the common insured then brought suit to compel the other insurer to contribute its prorata share of defense costs. Stating that the Montana Supreme Court has not specifically considered the issue of allocation of defense costs between primary and excess insurers, the Montana federal district court, sitting in diversity, predicted that the Montana Supreme

Court would adopt an equitable proration of defense costs among primary and excess insurers based upon the actual dollars contributed in settlement of the claim against the common insured, if a settlement had been reached.

> The respective obligations, as between several insurers who have covered the same risk[,] do not arise out of contract, but are based upon equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. Recognition of this fact compels the adoption of a rule which calls for a prorata allocation of defense costs between a primary and excess insurer, since it strikes an equitable balance between the insurers. Additionally, I find a rule of pro-rata allocation serves the best interests of the insured, since it alleviates a potential obstacle to an effective defense by tending to ensure that the insured will not be cast adrift as a result of the insurers' inability to agree upon their respective responsibilities.

*Id.* at 1397–98 (internal quotations and citations omitted). The Ninth Circuit Court of Appeals affirmed, noting that the equitable factors favoring proration of defense costs may not exist if the case had involved a true "excess" policy—that is, one specifically intended (and priced) to come into play only when the limits of the underlying coverage were exhausted, as opposed to a policy that became "excess" only because of an "other insurance" clause.

In *American States Ins. Co. v. Angstman Motors, Inc.*, 343 F.Supp. 576 (D.Mont.1972), the court confronted a case involving two liability insurers—one that insured a person whose employee drove a grain truck on a test basis prior to its purchase, and one that insured the car dealer who was attempting to sell the grain truck. After the truck was involved in an accident, the insurer of the individual whose employee test-drove the truck sued the other insurer to determine, in part, the obligation of defense in a suit brought as a result of the accident. After determining which carrier was primary and which was excess for purposes of insurance coverage,

the court held that the expenses of the defense, including attorney fees, should be prorated between the carriers based on the coverage provided by the policies of the respective carriers.

> From a practical standpoint, ... [the] primary coverage ... must be exhausted before the excess carrier is obligated to contribute to a judgment.... [H]owever, regardless of the outcome of the case or the amount of judgment or settlement, if any, [the excess insurer for coverage purposes] must contribute its prorata share of the defense costs. Thus, because [the excess insurer for coverage purposes] provides $100,000 maximum coverage of the total available maximum coverage of $400,000, American must pay one-fourth of the cost of ... defense.

*Id.* at 587.

■ Thus, regardless of which insurer is primary or excess for coverage or indemnity purposes, or what the eventual outcome of the case being defended is, two insurers having the duty to defend will be required under Montana law to share defense costs prorata on the basis of the maximum coverage provided by each insurer, compared to the total available maximum coverage under all policies. *See also Liberty Mut. Ins. Co. v. United States Fidelity & Guar. Co.*, 232 F.Supp. 76 (D.Mont.1964) (where comprehensive liability policy insuring company that rented truck and automobile liability and physical damage policy insuring truck owner both contained duty to defend lawsuit arising from accident, but only one insurer undertook the defense, court held insurer that defended was entitled to contribution from other insurer for defense expenses and attorney fees, to be shared on prorata basis per coverage afforded by policies; insurers' status as primary or excess not considered in resolving defense-cost issue; citing with approval *Continental Cas. Co. v. Zurich Ins. Co.*, 57 Cal.2d 27, 366 P.2d 455, 17 Cal.Rptr. 12 (1961)); *Continental Cas. Co. v. Zurich Ins. Co.*, 57 Cal.2d 27,

37–38, 366 P.2d 455, 461–62, 17 Cal.Rptr. 12, 18–19 (1961) (in suit between three insurance companies regarding coverage and duty of two companies to contribute to defense costs and attorney fees incurred by third company in defending personal injury action, court held that "all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers"; noting that contrary result would offer windfall to insurer who declines to carry out its contractual obligation to defend, and that "no insurer which deliberately breaches its obligation to the insured should be permitted thereby to profit, whether at the expense of the insured, or of an insurer which faithfully discharges its obligation"; "other insurance" clauses considered only in context of coverage issue).

The parties make much of which policy provides "primary" coverage and which provides "excess" coverage due to the operation of the policies' "other insurance" provisions. However, the cases cited above indicate that the primary/excess issue is one to be considered in the context of pure coverage or indemnity disputes,[8] and that defense cost allocation between two insurers is a different matter. *See* Douglas R. Richmond, *Issues & Problems in "Other Insurance," Multiple Insurance, and Self–Insurance* 22 Pepp. L.Rev. 1373, 1429 (1995) (generally "other insurance" clauses "speak only to loss allocation. In the liability insurance context, 'losses' are either covered judgments or settlements on the behalf of insureds. 'Other insurance' clauses thus relate only to insurers' indemnity obligations, and they do not even purport to address the allocation or apportionment of defense costs"); *Mountain West Farm Bureau Mut. Ins. Co. v. Credit General Ins. Co.*, 247 Mont. 161, 805 P.2d 569 (1991) (interpretation of "other insurance" clauses necessary to determine primary and excess coverage provided by

multiple policies; allocation of defense costs not at issue); *Guaranty Nat'l Ins. Co. v. State Farm Ins. Co.*, 238 Mont. 324, 777 P.2d 353 (1989) (same); *Bill Atkin Volkswagen, Inc. v. McClafferty*, 213 Mont. 99, 689 P.2d 1237 (1984) (same); *Mountain States Mut. Cas. Co. v. American Cas. Co.*, 135 Mont. 475, 342 P.2d 748 (1959) (same). Because the case at bar is not purely a coverage dispute, but instead concerns allocation of defense costs, I find it unnecessary to address the parties' primary/excess arguments.

St. Paul also argues that Coregis is not entitled to assert a cause of action against it for equitable contribution because the policies at issue do not insure against the same risk; that is, the Coregis policy provides broad coverage for errors and omissions with exclusions for bodily injury, personal injury, and injury caused by advertising, whereas the St. Paul policy provides advertising injury, bodily injury, and personal injury coverage. (St. Paul's Post–Trial Br. at 23; St. Paul's Reply Br. at 9.) However, as noted above, when contribution for defense costs is sought—as opposed to indemnification of the insured—the "same risk" rule does not apply, and contribution for such defense costs "may be procured by one liability insurer from another even though the two do not cover the same risks," presuming that the defense costs were incurred in a proceeding implicating a risk covered by the insurer from whom contribution is sought. *Couch on Insurance* § 218:4 (3d ed.1999), § 62:162 (2d rev. ed.1999). Even if the "same risk" rule were applicable, the St. Paul and Coregis policies both insured against the same risk of funding the defense of a lawsuit against the insured via St. Paul's contractual duty to defend and Coregis' duty to indemnify the insured for the costs of its defense.

The court recognizes that the above-cited cases are not factually identical to the dispute before the court—that is,

---

**8.** This case is not a pure coverage or indemnity dispute because—as to defense costs—St.

Paul only had a duty to defend, and only Coregis had a duty to indemnify.

a dispute between one insurer that breached its contractual duty to defend (St.Paul) and one insurer that had a duty to indemnify, as opposed to defend, its insured for those same defense costs (Coregis). Nevertheless, I find the equitable principles discussed in the above cases equally applicable to the case before me, and I find that the Montana Supreme Court, if confronted with this factual situation, would require Coregis and St. Paul to share defense costs prorata on the basis of the maximum coverage provided by each insurer, compared to the total available maximum coverage under both policies combined. I find that this would be the result regardless of which insurer is primary or excess for coverage or indemnity purposes.

Therefore, because the Coregis policy provided a $2,000,000 limit of liability and the St. Paul policy contained a $3,000,000 limit for advertising injury, Coregis is liable for 40 percent of the ASA's defense costs and attorney fees incurred in the Blue Dane Litigation, and St. Paul must pay 60 percent of those costs.[9] (Ex. 20 at 1 & Ex. 1 at E–7.)

### (ii) Equitable Subrogation

▇▇▇▇ Even if the Montana Supreme Court were to determine that Coregis could not recover against St. Paul on an equitable contribution theory, I conclude Coregis could so recover on its equitable subrogation theory. Equitable subrogation, under Montana law, is a theory of recovery that is not dependent upon a contractual relationship between the parties. *DeTienne Assocs. Ltd. Partnership v. Farmers Union Mut. Ins. Co.*, 266 Mont. 184, 192, 879 P.2d 704, 709 (1994).

> The purpose of subrogation is to prevent injustice by compelling the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment. Subrogation is the substitution of another person in the place of the creditor, so that the

person substituted will succeed to the rights of the creditor in relation to the debt or claim, and is an act of the law growing out of the relation of the parties to the original contract of insurance, and the natural justice or equities arising from the fact that the insurer has paid the insured, rather than a right depending upon the contract.

*Id.* at 188–189, 879 P.2d at 707 (internal citations and quotation marks omitted). " 'Subrogation presupposes an actual payment and satisfaction of a debt or claim to which the party paying is subrogated.' " *Skauge v. Mountain States Tel. & Telegraph Co.*, 172 Mont. 521, 526, 565 P.2d 628, 631 (1977) (quoting 16 *Couch on Insurance 2d* § 61.92).

Thus, Coregis became substituted for its insured, the ASA, when it paid the ASA $809,830.73 for the ASA's defense costs in the Blue Dane Litigation, and Coregis is now entitled to collect a portion of that same amount from St. Paul. *See St. Paul Fire & Marine Ins. Co. v. Allstate Ins. Co.*, 257 Mont. 47, 51, 847 P.2d 705, 707 (1993) (insured substituted for insured for subrogation purposes upon insurer's payment to insured under terms of policy); *State Farm Fire & Cas. Co. v. Cooperative of American Physicians, Inc.*, 163 Cal. App.3d 199, 209 Cal.Rptr. 251 (1984) (in subrogation action for declaration of coverage and reimbursement of settlement amount between premises liability insurer that paid settlement and medical malpractice carrier that refused to contribute to settlement where both insurers had duty to defend, court held insurer paying settlement amount was entitled to equitable subrogation against other insurer, even though policies covered different risks, noting that insurer that deliberately breaches its obligation to its insured should not benefit at the expense of its insured or an insurer that discharges its obligation).

9. $2,000,000 is 40 percent of the total available maximum coverage provided by the two

policies combined ($5,000,000), and $3,000,000 is 60 percent of that amount.

#### d. ASA's Theory of Recovery

The ASA seeks to recover from St. Paul attorney fees and expenses incurred by the ASA as a result of St. Paul's breach of its contractual duty to defend the ASA in the Blue Dane Litigation. (Filing 21, ASA's Amended Complaint, at 21.) When an insurer wrongfully refuses to defend its insured pursuant to its contractual obligation to do so, the refusal to defend is a breach of contract, thereby rendering the insurer liable to its insured for defense costs, including attorney fees, resulting from the breach. *Grindheim v. Safeco Ins. Co.*, 908 F.Supp. 794, 808 (D.Mont.1995) (insurer that breached duty to defend liable to insured for all damages sustained as result of breach); *Truck Ins. Exchange v. Woldstad*, 212 Mont. 418, 423, 687 P.2d 1022, 1025 (1984) (insurer's breach of contractual duty to defend renders insurer liable for attorney fees and defense costs resulting from such breach); *Home Ins. Co. v. Pinski Bros., Inc.*, 160 Mont. 219, 227–28, 500 P.2d 945, 950 (1972) (insurer that breached duty to defend lawsuit against its insured liable for attorney fees, expenses, and court costs incurred by insured in defending himself); *Independent Milk & Cream Co. v. Aetna Life Ins. Co.*, 68 Mont. 152, 216 P. 1109, 1110 (1923) (refusal of insurer to defend action against insured was breach of contract, entitling insured to recover "such damages as were the natural and ordinary consequence of the breach").

As previously held in my order resolving the parties' summary judgment motions, St. Paul breached its contractual duty to defend the ASA. *American Simmental Ass'n v. Coregis Ins. Co.*, 75 F.Supp.2d 1023, 1032 (D.Neb.1999). Accordingly, St. Paul is liable for the defense costs and expenses, including attorney fees, incurred by the ASA in defending itself in the Blue Dane Litigation.

#### e. St. Paul's Defenses

#### (i) False Material Exclusion

St. Paul argues that the provision in its policy excluding from coverage "advertising injury that results from written or spoken material made public by or for the protected person if the material is known by that person to be false" precludes coverage for any advertising alleged in the initial Blue Dane Complaint. (St. Paul's Post–Trial Br. at 20–21; St. Paul's Reply Br. at 2–4.) Coregis objects to the court's consideration of this false material exclusion because St. Paul failed to raise the defense in its pleadings, motions, and in the pretrial order. (Coregis' Post–Trial Br. at 9–10; Coregis' Reply Br. at 5–7; Tr. 76.)

"While state law defines the nature of the defenses, the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs." *Healy Tibbitts Constr. Co. v. Insurance Co. of North America*, 679 F.2d 803, 804 (9th Cir.1982). Montana courts have characterized insurance policy exclusions as affirmative defenses. *Wellcome v. Home Ins. Co.*, 257 Mont. 354, 356, 849 P.2d 190, 192 (1993); *Home Ins. Co. v. Pinski Bros., Inc.*, 156 Mont. 246, 249, 479 P.2d 274, 276 (1971). Federal Rule 8(c) requires affirmative defenses to be "set forth" in a responsive pleading. However, the Ninth Circuit Court of Appeals has liberalized this requirement by holding that a defendant may raise an affirmative defense for the first time in a motion for summary judgment, providing there is no claimed or apparent prejudice to the nonmoving party. *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877–78 (9th Cir.1995); *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993); *Healy Tibbitts Constr. Co.*, 679 F.2d at 804; *Buhl v. Biosearch Med. Prod., Inc.*, 635 F.Supp. 956, 959 (D.Mont. 1985).

In *Towe Antique Ford Found. v. Internal Revenue Serv.*, 1991 WL 325792, at *2–3 (D.Mont. Aug.2, 1991), the United States District Court for the District of Montana allowed the defendant to assert an affirmative defense at trial, despite the fact that the defense was not asserted in a

responsive pleading, but rather in written discovery responses and in the context of a summary judgment motion. The court found that because the plaintiff had knowledge of the affirmative defense at least five and one-half months before trial, and because the plaintiff would be granted leave to conduct further discovery on the issue during that time, "any prejudice which might have otherwise resulted from allowing the late assertion of this defense has been cured." *Id.* at *3. The pretrial order was then amended to reflect that the defendant was permitted to present the affirmative defense at the time of trial.

In contrast, St. Paul did not raise the false material exclusion as an affirmative defense or otherwise until approximately one month before trial (and three months *after* entry of the Joint Order on Pretrial Conference (filing 87)) when it filed a motion for leave to file a "renewed" motion for summary judgment, for relief from judgment, and to certify for interlocutory appeal (filing 111). The defense was not discussed in the motion itself; rather, it was raised in the brief submitted in support of St. Paul's motion. I denied St. Paul's motion (filing 114) as untimely and because an Eighth Circuit case on which St. Paul relied was not substantively persuasive, and trial commenced approximately one month later.

In short, St. Paul did not raise the defense in any of its letters to the ASA denying insurance coverage for the Blue Dane matter (exs.8, 10, 12), or in any court document until its filing of an untimely motion for leave to file a summary judgment motion one month before trial. Because I denied St. Paul's belated motion, and because no other court document hinted that St. Paul had, or would, assert the false material exclusion defense, neither the ASA nor Coregis moved for an extension of the progression order or for a trial continuance to allow them to review and prepare to meet St. Paul's newly asserted defense.

Because the ASA and Coregis would be greatly prejudiced by St. Paul's late asser-

tion of its false material exclusion defense under the circumstances in this case, I decline to consider St. Paul's defense pursuant to Fed.R.Civ.P. 8(c), as liberalized by the Ninth Circuit Court of Appeals and applied by Montana courts.

### (ii) "Volunteer" Defense

St. Paul asserted at trial that because Coregis acted as a volunteer in paying the ASA for its defense costs associated with the Blue Dane Litigation, Coregis has no right to recover such costs from St. Paul. (*See also* Filing 23, St. Paul's Answer to Third Party Complaint ¶ 32.) I am not persuaded by St. Paul's argument.

A volunteer has been defined as a "stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay under the circumstances." *State Farm Fire & Cas. Co. v. Cooperative of American Physicians, Inc.,* 163 Cal.App.3d 199, 203, 209 Cal.Rptr. 251 (1984) (internal quotation marks and citations omitted). Contrary to this definition, Coregis admits that it was "obligated [under its policy] to indemnify the ASA for all of its defense costs incurred in the *Blue Dane* Litigation." (Coregis' Post–Trial Br. at 3.) Thus, Coregis should "not now be penalized for fulfilling its contractual ... obligations by deeming it a volunteer." *Guaranty Nat'l Ins. Co. v. State Farm Ins. Co.,* 238 Mont. 324, 330, 777 P.2d 353, 357 (1989) (excess insurer entitled to indemnification and subrogation by primary insurer when excess insurer negotiated settlement and primary insurer did not participate in such settlement). *See also State Farm Fire & Cas. Co. v. Cooperative of American Physicians, Inc.,* 163 Cal. App.3d at 203–04, 209 Cal.Rptr. 251 (premises liability insurer that was obligated to defend insured based on allegations of complaint was not a volunteer when it settled case before trial); *Federal Ins. Co. v. Southwestern Wire Cloth, Inc.,* No. 95–C–689–K, 1999 U.S. Dist. LEXIS 4273, at *13–14 (N.D.Okla. Feb. 8, 1999) (insurer that breached duty to defend contended defending insurer not entitled to equitable subrogation because it acted as volunteer

in undertaking defense of lawsuit against common insured; court rejected such claim, stating, "The mischief such a ruling would cause is apparent. Whenever two insurers were tendered a defense, each would hold back, hoping the other would undertake the defense and be subsequently labeled a 'volunteer'.".").

## 2. Reasonableness of Defense Costs and Attorney Fees

All parties agree that the damages that may be assessed against St. Paul for the breach of its contractual duty to defend the ASA in the Blue Dane Litigation must be reasonable. (ASA's Post–Trial Br. at 3–5 (it is "obvious" that the ASA may only recover reasonable defense costs); Coregis' Post–Trial Br. at 27; St. Paul's Reply Br. at 4.) See also Continental Cas. Co. v. Zurich Ins. Co., 57 Cal.2d 27, 37, 366 P.2d 455, 461, 17 Cal.Rptr. 12, 18 (1961) ("where the insurer defaults in defending, the indemnity obligation will be held to cover all expenses reasonably incurred by the insured in providing his own defense"); Mont.Code Ann. § 27–1–302 (1999) ("Damages must in all cases be reasonable . . . ."); 14 Couch on Insurance 3d § 202:7,

at 202–31 (1999) ("Where an insured retains his or her own counsel to defend the case and it is subsequently determined that the insurer unjustifiably denied coverage, the insured is entitled to be reimbursed for reasonable attorney's fees and disbursements. What is reasonable is generally determined by the reasonable fees paid to defense counsel within the particular jurisdiction.").

In determining what are "reasonable" defense costs and attorney fees, St. Paul suggests that the court apply either the "lodestar" method [10] that is used in cases involving federal fee-shifting statutes or, alternatively, independently "evaluate the work done by the attorneys and set a reasonable defense fee." (St. Paul's Reply Br. at 4.) Coregis suggests the court use the factors for determining reasonable attorney fees found in DR 2–106 [11] of the Code of Professional Responsibility. (Coregis' Post–Trial Br. at 27.) Finally, the ASA suggests that the reasonableness of attorney fees should be determined using the factors set forth in Morning Star Enterprises, Inc. v. R.H.Grover, Inc., 247 Mont. 105, 113, 805 P.2d 553, 558 (1991).[12] (ASA's Reply Br. at 1–2.)

---

**10.** See City of Burlington v. Dague, 505 U.S. 557, 559 & 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (the "lodestar" approach to determining reasonable attorney fees is " 'the product of reasonable hours times a reasonable rate' " and is used in cases involving federal fee-shifting statutes) (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)).

**11.** DR 2–106 provides in part:
(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.
Code of Professional Responsibility DR 2–106 (West 2000).

**12.** Morning Star sets forth the following non-exclusive factors to be considered when determining the reasonableness of attorney fees:

(1) the amount and character of the services rendered; (2) the labor, time, and trouble involved; (3) the character and importance of the litigation in which the services were rendered; (4) the professional skill and experience required; (5) the character and standing of the attorneys in their

■ Because this is a contract action under Montana law in which an insurer and the insured seek damages in the form of attorney fees and defense costs occasioned by another insurer's breach of its duty to defend, I decline to apply the "lodestar" method used in federal fee-shifting cases. *See United States ex rel. C.J.C., Inc. v. Western States Mech, Contractors, Inc.*, 834 F.2d 1533, 1547–50 (10th Cir. 1987) (in construction contract dispute to enforce, in part, attorney fee provision of contract, district court erred in relying on federal standards for awarding attorney fees under federal Civil Rights Act to independently calculate reasonable fee; purpose of awarding attorney fees in context of contract dispute is to make non-breaching party whole and to enforce parties' bargain, whereas fee awards under federal fee-shifting statutes are aimed at enabling private parties to get legal help regarding alleged violations of specific federal laws; in contract dispute, court should enforce attorney fee provision of contract according to terms of agreement, with appropriate adjustment—or denial—of fees requested when award would be inequitable or unreasonable). Rather, I shall use the standard articulated by the Montana Supreme Court in *Morning Star Enterprises, Inc. v. R.H.Grover, Inc.*, 247 Mont. 105, 113, 805 P.2d 553, 558 (1991) for determining reasonable attorney fees in actions to enforce contracts (*see supra* note 12), remaining mindful that the *Morning Star* factors are not exclusive, that I may consider other factors as well, and that the "reasonableness of attorney's fees must be ascertained under the facts of each case." *Id.* at 113–14, 805 P.2d at 558.[13]

■ The record establishes the following facts that are to be considered as part of the *Morning Star* reasonableness analysis. The Blue Dane Litigation, against which St. Paul refused to defend the ASA, was complex litigation spanning five years in which the plaintiffs brought antitrust, RICO, Lanham Act, and negligence claims and which involved three different sets of plaintiffs' counsel, as well as a period of time in which the plaintiffs appeared pro se. The plaintiffs sought several millions in damages, an amount which was well beyond the ASA's ability to pay, making it a "survival" lawsuit for the ASA. (Tr. 141, 410.) Due to the numerous discovery disputes and pretrial motions, the ASA's counsel submitted 40 briefs (Tr. 418) over the course of the litigation, participated in a nine-day trial (Ex. 22) resulting in judgment as a matter of law in favor of the ASA after I granted its motion pursuant to Fed.R.Civ.P. 50 (Ex. 23), and successfully defended its judgment against 29 assignments of error on appeal (Tr. 315).

The Blue Dane Litigation was plagued by legal complexities that can fairly be said to have complicated ASA counsels' task, including: the shifting nature of the plaintiffs' claims, especially as each set of new counsel became involved; the plaintiffs' production of voluminous documents; three separate sets of discovery which required the ASA to produce over 60,000 pages of documents (Tr. 411) from over a 20–year period which required the preparation of numerous privilege logs and redacted copies of documents (Tr. 118); the ASA's need to utilize a number of genetic and economic expert witnesses, including economic experts to develop an econometric model of the registered cattle market to rebut the plaintiffs' claim that the improper registration of the Risinger animals caused the fullblood market to crash

---

profession; and (6) the result secured by the services of the attorneys.
*Morning Star*, 247 Mont. at 113, 805 P.2d at 558.

**13.** None of the parties have specifically suggested that the law of the forum state (Nebraska) governs the method of determining the reasonableness of attorney fees claimed. *See, e.g., City of Carter Lake v. Aetna Cas. &*

*Sur. Co.*, 604 F.2d 1052, 1062 (8th Cir.1979) (if Nebraska statute allowing award of attorney fees as part of costs was substantive, law of the state governing the contract would control attorney fee issue, but if statute was procedural, law of the forum must be applied; holding statute to be procedural, thus applying Nebraska law to attorney fee issue).

(Tr. 110–112, 118–120); a 295–page expert witness disclosure in which its author purported to opine on various genetic issues and laws relating to cattle registration under the European Economic Community, Federal Republic of Germany, and Bavarian state laws (Tr. 110–116); issues of international law that necessitated international travel and interviews and depositions of foreign witnesses; difficulties encountered in producing a court-ordered joint set of jury instructions (Tr. 312–14); and difficulties encountered on appeal due to the plaintiffs' use of facts and exhibits outside the trial record, the plaintiffs' submission of a 1,600–page disorganized appendix, and the plaintiffs' assertion of new arguments in their reply brief (Tr. 316–21).

The Blue Dane Litigation also presented the ASA's attorneys with administrative and damage-control challenges, including leaks of confidential ligation information to the plaintiffs (Tr. 105–106); personal attacks on ASA staff in newspapers, newsletters, and the Internet by people the ASA believed to be the plaintiffs (Tr. 415); and counsels' attempt to control the flow of confidential information to prevent further leaks, while still providing the ASA's 16–member board with sufficient information to allow board members to respond to their constituents (Tr. 109).

Besides being well-regarded in the legal community, the counsel selected by the ASA to defend the Blue Dane Litigation were especially well-equipped to do so. Mr. Ogborn is experienced in handling complex litigation and is familiar with cases involving RICO and antitrust issues. (Ex. 161, at 25–29.) Besides holding a law degree with high honors, Mr. Summerlin has an undergraduate degree in animal science and agricultural economics, in pursuit of which he completed coursework in animal science and genetics, as well as animal husbandry, breeding, and reproduction. He has provided legal representation to a number of livestock breed associations and has been involved in a number of complex legal disputes. (Tr. 77–81.) Ms. Kester holds a law degree with high honors, as well as an undergraduate degree in animal science for which she completed courses in animal husbandry and animal genetics. (Tr. 292–93.)

While not disputing the complexity of the Blue Dane Litigation, as described above, or the credentials of counsel, St. Paul generally complains (without addressing the *Morning Star* factors) that the counsel hired by the ASA to defend it during the Blue Dane Litigation spent an unreasonable amount of time on various tasks, greatly exceeded their initial anticipated defense budget, prepared vague time entries, and charged their clients for unreasonable tasks. (St. Paul's Post–Trial Br. at 5–18; St. Paul's Reply Br. at 4–5.)

It is true that "[a]n insurance company that wrongfully fails to defend an action may not later dispute litigation strategies undertaken by the defense in an action which it refused to cover." *Foxfire, Inc. v. New Hampshire Ins. Co.*, No. C–91–2940 MHP ARB & No. C–91–3464 MHP, 1994 WL 361815, 1994 U.S. Dist. LEXIS 9249, at *4, 9, 11 (N.D.Cal. July 1, 1994) (having forced its insured into marketplace to retain counsel, insurer that breached duty to defend cannot complain about paying marketplace rates or about time spent by outside counsel if time spent is not unreasonable on its face; court declined to engage in post hoc critique of outside counsel's litigation strategy). *See also Arenson v. National Auto. & Cas. Ins. Co.*, 48 Cal.2d 528, 538, 310 P.2d 961, 967–68 (1957) (insurer cannot wrongfully refuse to defend, force insured to retain outside counsel, and then complain about services reasonably performed simply because defense not handled to insurer's liking). It is also true that the Blue Dane Litigation was complex and was guided by skilled and thorough counsel who achieved an excellent result for their client.

However, and as all parties agree, the overarching inquiry here is reasonableness. After careful review of the invoices and billing summaries received as evidence in this case, I conclude that the recorded

time spent by ASA's retained counsel on several tasks was clearly excessive, and it is evident that counsel have failed to exercise billing judgment—especially with respect to time-intensive projects. Therefore, the request for defense costs in the amount of $1,199,178.00 is unreasonable and it should be reduced by 25 percent to $899,383.50.[14]

## B. ASA/COREGIS' ENTITLEMENT TO PREJUDGMENT INTEREST

The ASA and Coregis assert they are entitled to prejudgment interest on any judgment rendered in their favor pursuant to Mont.Code Ann. §§ 27–1–211 and 31–1–106 [15] (1999).[16] (Joint Order on Pretrial Conf. ¶ C(5).)

Mont.Code Ann. § 27–1–211 provides:

Every person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day except during such time as the debtor is prevented by law or by the act of the creditor from paying the debt.

In order to recover prejudgment interest under section 27–1–211, the ASA and Coregis must establish "(1) an underlying monetary obligation; (2) the amount of recovery is certain or capable of being made certain by calculation; and (3) the

right to recover the obligation vests on a particular day." *Byrne v. Terry*, 228 Mont. 387, 390, 741 P.2d 1341, 1343 (1987). Montana law does not require the damages on which prejudgment interest is sought to be liquidated, but only ascertainable through calculation. *Transamerica Premier Ins. Co. v. Miller*, 41 F.3d 438, 446–47 (9th Cir.1994) (applying Montana law on prejudgment interest). "Prejudgment interest is inappropriate when the amount of a party's damages is uncertain or disputed." *Northern Montana Hosp. v. Knight*, 248 Mont. 310, 320, 811 P.2d 1276, 1282 (1991).

Despite its statement that recovery of prejudgment interest under section 27–1–211 should be "the rule rather than the exception," *Price Bldg. Svc., Inc. v. Holms*, 214 Mont. 456, 468, 693 P.2d 553, 559 (1985), the Montana Supreme Court has reversed prejudgment interest awards under this statute in breach-of-contract actions when the amount of damages recoverable could not be ascertained until determination by the court or jury. *Northern Montana Hosp.*, 248 Mont. 310, 811 P.2d 1276 (in hospital's breach of contract action against architect, lower court properly denied hospital's motion for prejudgment interest under section 27–1–211 when much damage evidence was produced at trial and amount of damages claimed by hospital did not correspond to

14. For example, the ASA's counsel spent 586.8 hours on their first motion for summary judgment, for a billed total of $72,126.00. Despite the fact that these hours included document review and research on all four causes of action, the time spent on this task, and the amount billed for it, are beyond the bounds of reasonableness. Also unreasonable is the time spent by the ASA's counsel in defending the plaintiffs' appeal to the Eighth Circuit—565.7 hours, resulting in a billing total of $67,944.00. (Ex. 14.)

15. Mont.Code Ann. § 31–1–106 generally states that interest is payable at the rate of 10 percent per year after an amount becomes due on an instrument of writing, an account stated, money due on any settlement of accounts, or money received for the use of another and detained from him.

16. Montana courts apparently view section 27–1–211 as substantive. *Price Bldg. Svc., Inc. v. Holms*, 214 Mont. 456, 468, 693 P.2d 553, 559 (1985) (section 27–1–211 "is merely part of the law of damages that has, as its objective, that of making the injured person whole"). Therefore, the issue of prejudgment interest is to be resolved pursuant to the law governing construction of the contract at issue (Montana law), as opposed to the procedural law of the forum (Nebraska law). See *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 437 (8th Cir.1994); *City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1062 (8th Cir.1979), cited *infra*. The parties have not specifically discussed this issue, and the Joint Order on Pretrial Conference preserves as a controverted issue only whether the ASA and Coregis are entitled to prejudgment interest under Montana statutes.

jury's verdict, evidencing uncertain and disputed nature of damages); *Morning Star Enterprises, Inc. v. R.H. Grover, Inc.*, 247 Mont. 105, 805 P.2d 553 (1991) (reversing award of prejudgment interest under section 27–1–211 when trial court required to determine damages owing for work that subcontractor failed to perform in reasonable and workmanlike manner; since damages requested were not for items specifically set forth in contract, damages were not certain until court delivered judgment); *Maddux v. Bunch*, 241 Mont. 61, 784 P.2d 936 (1990) (in suit by insured against insurer for breach of contract and unfair claim settlement practices, award of prejudgment interest under section 27–1–211 not appropriate because claimed loss differed from jury award, establishing that requested damages were not capable of being made certain by calculation and amount of damages due upon breach were not clearly ascertainable until determined by trial court); *Carriger v. Ballenger*, 192 Mont. 479, 486, 628 P.2d 1106, 1110 (1981) (award of prejudgment interest pursuant to section 27–1–211 erroneous when damages for breach of construction contract were not clearly ascertainable until determined by trial court; "Since this is not an action on a negotiable instrument or for the definite unpaid balance of a contract or account where the damages are a sum certain, section 27–1–211, MCA, is not applicable." (internal citations omitted)).

■ As in the above-cited cases, I conclude that the amount of defense costs, including attorney fees, recoverable in this action due to St. Paul's breach of its duty to defend the ASA is uncertain, disputed, and not ascertainable by calculation until the court's determination of such amount in its forthcoming judgment. The court's main task in this case is to determine the amount of reasonable defense costs awardable to the ASA and Coregis after considering conflicting expert opinions and other evidence and performing a multi-factor "reasonableness" analysis in the unique context of this case. Under such circumstances, the resulting amount upon which prejudgment interest is sought to be awarded is not "certain or capable of being made certain by calculation" until the date of the court's judgment, making a prejudgment interest award in this case inappropriate under Montana law. *Byrne v. Terry*, 228 Mont. 387, 390, 741 P.2d 1341, 1343 (1987).

## C. *ASA/COREGIS' ENTITLEMENT TO ATTORNEY FEES & EXPENSES FOR BRINGING THE PRESENT LITIGATION*

■ The ASA and Coregis both claim they are entitled to attorney fees and expenses for bringing this litigation against St. Paul pursuant to Neb.Rev.Stat. Ann. § 44–359 (Michie 1995), which provides in part:

> In all cases when the beneficiary or other person entitled thereto brings an action upon any type of insurance policy ... against any company ... doing business in this state, the court, upon rendering judgment against such company, ... shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs.

Because Nebraska courts have characterized the above statute as procedural, "it applies to federal diversity actions in Nebraska regardless of the substantive law governing the insurance contract involved"—in this case, the substantive law of Montana. *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 437 (8th Cir.1994). *See also City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1062 (8th Cir.1979) (if Neb.Rev.Stat. § 44–359 is substantive, law of the state governing the contract controls attorney fee issue, but if § 44–359 is procedural, law of the forum must be applied; holding § 44–359 to be procedural, thus applying Nebraska law to attorney fee issue); *Hawkeye Cas. Co. v. Stoker*, 154 Neb. 466, 485, 48 N.W.2d 623, 634 (1951) (Neb.Rev.Stat. § 44–359 is procedural).

 Because the ASA's lawsuit against St. Paul is "an action upon [the] ... insurance policy" between them, I conclude that the ASA is entitled to reasonable attorney fees in addition to the amount of its recovery, to be taxed as part of the costs in this matter. Neb.Rev.Stat. Ann. § 44–359; *Metcalf v. Hartford Accident & Indem. Co.*, 176 Neb. 468, 478, 126 N.W.2d 471, 477 (1964) (attorney fee awarded pursuant to Neb.Rev.Stat. § 44–359 is taxable as costs and constitutes no part of the judgment; interest was properly chargeable on the judgment, but not on attorney fees that constituted no part of the judgment). Accordingly, I shall order that the ASA file an application for reasonable attorney fees incurred in bringing this lawsuit.

 However, because Coregis' lawsuit against St. Paul cannot be characterized as "an action upon" the policy between the ASA and St. Paul, but rather as one to determine allocation or priority of liability as between different insurers of a common insured, Coregis is not entitled to attorney fees pursuant to Neb.Rev.Stat. Ann. § 44–359. *See Dairyland Ins. Co. v. Kammerer*, 213 Neb. 108, 112–113, 327 N.W.2d 618, 621 (1982) (while beneficiaries of insurance policy were entitled to attorney fees under Neb.Rev.Stat. § 44–359 for prevailing in action against insurer upon liability insurance policy, statute inapplicable to second insurer who also sued beneficiaries' insurer to determine which policy provided primary coverage for automobile accident); *Lara v. Employers Mut. Cas. Co.*, No. A–93–079, 1994 WL 559289, at *3 (Neb.Ct. App.1994) (state district court erroneously awarded attorney fees pursuant to Neb. Rev.Stat. § 44–359 in lawsuit between three insurers to determine respective liabilities related to automobile accident; because action was one to adjust priorities of liability between insurers, as opposed to "an action upon" an insurance policy, § 44–359 was inapplicable) (unpublished opinion).

### III. CONCLUSION

Based on the reasons stated above, I reach the following conclusions:

1. St. Paul's duty to defend the ASA in the Blue Dane Litigation arose by virtue of the facts alleged in the Blue Dane initial Complaint and St. Paul's duty to defend was triggered upon the ASA's tender of the initial Complaint to St. Paul on April 18, 1994. St. Paul had a duty to defend the ASA against all claims included in the Blue Dane Litigation, despite the fact that the Blue Dane initial Complaint may have contained claims outside the coverage provided by St. Paul's policy.

2. St. Paul is liable for the ASA's reasonable attorney fees, expenses, and court costs incurred in defending itself against all claims asserted in the Blue Dane Litigation.

3. Under an equitable contribution theory or, alternatively, an equitable subrogation theory, the Montana Supreme Court, if confronted with this factual situation, would require Coregis and St. Paul to share defense costs prorata on the basis of the maximum coverage provided by each insurer, compared to the total available maximum coverage under both policies combined. This would be the result regardless of which insurer is primary or excess for coverage or indemnity purposes. Therefore, because the Coregis policy provided a $2,000,000 limit of liability and the St. Paul policy contained a $3,000,000 limit for advertising injury, Coregis is liable for 40 percent of the ASA's defense costs and attorney fees incurred in the Blue Dane Litigation, and St. Paul must pay 60 percent of those costs.

4. I decline to consider St. Paul's false material exclusion defense pursuant to Fed.R.Civ.P. 8(c), as liberalized by the Ninth Circuit Court of Appeals and applied by Montana courts.

5. Coregis did not act as a volunteer in paying the ASA for its defense costs associated with the Blue Dane Litigation.

6. The request for recovery of defense costs, including attorney fees, incurred in the Blue Dane Litigation in the amount of $1,199,178.00 is unreasonable and should

be reduced by 25 percent to $899,383.50. St. Paul is liable for 60 percent ($539,630.10) of that amount and Coregis is liable for 40 percent ($359,753.40) of that amount. Because Coregis has already paid $809,830.73 to the ASA for such defense costs, it has overpaid the ASA by $450,077.33. Accordingly, St. Paul's liability ($539,630.10) should be apportioned between the ASA and Coregis, with St. Paul owing to Coregis $450,077.33 (the amount of Coregis' overpayment to the ASA) and with St. Paul owing to the ASA $89,552.77.

7. The ASA and Coregis are not entitled to an award of prejudgment interest pursuant to Mont.Code Ann. § 27–1–211.

8. Pursuant to Neb.Rev.Stat. Ann. § 44–359, the ASA is entitled to reasonable attorney fees for bringing this lawsuit against St. Paul, in addition to the amount of its recovery, to be taxed as part of the costs in this matter. Accordingly, I shall order the ASA to file an application for reasonable attorney fees incurred in bringing this lawsuit against St. Paul. Coregis is not entitled to such attorney fees.

Accordingly,

IT IS ORDERED:

1. Judgment shall be entered by separate document [17] against defendant St. Paul Fire & Marine Insurance Company and in favor of plaintiff American Simmental Association in the amount of $89,552.77;

2. Judgment shall further be entered against third-party defendant St. Paul Fire & Marine Insurance Company and in favor of third-party plaintiff Coregis Insurance Company in the amount of $450,077.33; and

3. Plaintiff American Simmental Association shall file an application for reasonable attorney fees incurred in bringing this lawsuit against St. Paul Fire & Marine

Insurance Company, to be taxed as part of the costs in this matter.

---

17. The court is entering judgment at this time given the unavailability of prejudgment interest in this case and the size of the judgment. *See* Fed.R.Civ.P. 58 (entry of judgment shall not be delayed in order to tax costs or award fees). However, the court now orders that if a timely motion for attorney fees is filed un-

der Fed.R.Civ.P. 54(d)(2) before a notice of appeal is filed and becomes effective, such motion shall have the same effect under Rule 4(a)(4) of the Federal Rules of Appellate Procedure as a timely motion under Fed.R.Civ.P. 59.